2004 WY 78

**GDK, Appellant (Respondent),**

v.

**STATE of Wyoming, DEPARTMENT OF FAMILY SERVICES; State of Wyoming, ex rel., DDK and MK, a/k/a MW, minor children, Appellees (Petitioners).**

No. C–03–10.

Supreme Court of Wyoming.

June 30, 2004.

Representing Appellant: Matthew F.G. Castano of Brown & Hiser, LLC, Laramie, Wyoming.

Representing Appellees: Cynthia L. Harnett of Harnett Law Office, LLC, Casper, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ., and PARK, D.J.

PARK, District Judge.

[¶ 1] TAK, mother of the children in question, was married to GDK, appellant herein, at the time her children, DDK and MK, were born; however, she had a relationship with JMW and was living with him at the time of both births. Genetic testing established that JMW was the biological father of the children. Both GDK and JMW asserted paternity as to both children. The district court determined that JMW was the legal father of the minor children. GDK appeals from the decision on several grounds.

[¶ 2] We affirm.

## ISSUES

1. Whether the district court correctly chose between two conflicting statutory presumptions and properly applied this presumption to determine that JMW was the father of DDK.

2. Whether the district court correctly applied the genetic testing presumption to determine that JMW was the father of MK.

## FACTS

[¶ 3] TAK and GDK were married on December 31, 1998, and two children were born during this marriage: DDK born July 17, 2001, and MK (also known as MW) born May 3, 2002. During a period from prior to DDK's birth until shortly after MK's birth, TAK and JMW had a relationship and lived together in an on-again, off-again manner. TAK and JMW had a disagreement, and TAK moved out shortly after MK was born. Shortly thereafter, on June 4, 2002, TAK and GDK were divorced, but then remarried on November 2, 2002.

[¶ 4] The State of Wyoming filed a Petition to Establish Support on March 21, 2002, and then filed an Amended Petition to Establish Paternity and Support after the birth of MK. Both GDK and JMW responded to the amended pleadings and each sought a declaration that he was the father of both children. TAK, the mother, also responded, seeking a declaration of paternity and asking for custody of the children. The district court ordered genetic testing, and these tests resulted in a finding that there was a 99.9% probability that JMW was the father of both children.

[¶ 5] JMW's request to establish paternity was made within six months of the birth of MK but not within six months of DDK's birth. The statute in effect at the time had a time limit of six months within which a man could bring an action to establish paternity. Wyo. Stat. Ann. § 14–2–104(c) (LexisNexis 2001). JMW was time-barred as to DDK; however, he did bring his action to establish paternity in a timely manner for MK. Because of the statutory time limitations, the district court was required to do a separate analysis for each child. The determination of paternity for DDK involved determination of conflicting statutory presumptions, and the determination of paternity for MK involved a statutory presumption on one hand and the impact of a positive genetic test on the other.

[¶ 6] Regarding DDK, the district court had to make a determination as between two different conflicting presumptions in the applicable statute. GDK claimed paternity under Wyo. Stat. Ann. § 14–2–102(a)(i) (LexisNexis 2001), which provided that a man was presumed to be the natural father of a child if the child was born during the marriage. The claim of JMW rested on Wyo. Stat. Ann. § 14–2–102(a)(iv) (LexisNexis 2001), providing that a man was presumed to be the father of a child if he "receives the child into his home and openly holds out the child as his natural child." The district court held an evidentiary hearing and determined that JMW had received the child into his home and openly acknowledged DDK as his. The parties agreed that TAK and GDK were married at the time of DDK's birth. Therefore, as to DDK, each man could assert a

statutory presumption. The controlling statute, Wyo. Stat. Ann. § 14–2–102(b) (LexisNexis 2001), provided that when there were two or more conflicting presumptions, the presumption based on the weightier considerations of policy and logic would control.

[¶ 7] As to DDK, the district court found that the "holding out" presumption took priority; and as to MK, the district court found that, in addition, there was no evidence to rebut the results of the genetic testing. Thus, for different reasons, the district court determined that JMW was the legal father of both children.

## DISCUSSION

### DDK ANALYSIS

[¶ 8] GDK argues that the district court improperly weighed the conflicting presumptions asserted by each of the men who claimed paternity. Resolution of this issue requires interpretation of the paternity statutes in effect at the time of the action. Therefore, the standard of review for statutory construction applies. The first consideration, when interpreting statutes, is to determine the legislature's intent. *In re State, Div. of Child Support Enforcement, ex rel. NDB,* 35 P.3d 1224, 1229 (Wyo.2001). When a court seeks to ascertain the meaning of a given law, all statutes must be construed in *pari materia* and all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. *Id.* Since statutory construction is a question of law, our standard of review is de novo. *Id.* We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. *Id.* We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia*. *Fontaine v. Board of County Commissioners of Park County,* 4 P.3d 890, 895 (Wyo.2000).

[¶ 9] At the time of this action, Wyo. Stat. Ann. § 14–2–102 (LexisNexis 2001) set forth certain presumptions to be used by a court to determine paternity. This statute provided, in pertinent part:

(a) A man is presumed to be the natural father of a child if:

(i) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within three hundred (300) days after the marriage is terminated by death, annulment or divorce or after a decree of separation is entered by the court.

\* \* \*

(iv) While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child.

(b) A presumption under subsection (a) of this section may be rebutted in an appropriate action only by clear and convincing evidence. If two (2) or more presumptions under subsection (a) of this section arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. A presumption under subsection (a) of this section is rebutted by a court decree establishing paternity of the child by another man or, after the court finds by clear and convincing evidence that the child was not born of the marriage, by a divorce decree expressly declaring the child was not born of the marriage.

[¶ 10] The first issue mandates a discussion of the evolution of a presentation necessary to overcome the enduring and strongly supported marital presumption. The marital presumption was derived from Roman civil law and adopted as part of English common law. Edward R. Armstrong, *Putative Fathers and the Presumption of Legitimacy— Adams and the Forbidden Fruit: Clashes Between the Presumption of Legitimacy and the Rights of Putative Fathers in Arkansas,* 25 U. Ark. Little Rock L.Rev. 369, 373 (2003). This common law rule was in place to prevent the "bastardization" of children with the attendant lack of legal rights. Armstrong, *supra.* Furthermore, the courts wanted to provide families for children because such families "were desirable for such children and for the kingdom as a whole." Judge Chris W. Altenbernd, *Quasi-marital*

*Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform*, 26 Fla. St. U.L.Rev. 219, 234 (1999).

[¶ 11] Challenges to the marital presumption arose from many quarters, including the push to obtain child support from fathers in lieu of public support. Theresa Glennon, *Somebody's Child: Evaluating the Erosion of the Marital Presumption of Paternity*, 102 W. Va. L.Rev. 547, 557–58 (2000). Part of this challenge also derived from the advances in science, including DNA testing. This testing provided substantially improved reliability in paternity determinations. Glennon, *supra*. Thus, courts have increasingly been required to make decisions as to whether the mother's husband or the biological father should be declared to be the legal father of the child in question. This has generated discussions as to the proper role of the "best interests of the child" as a factor in resolving paternity issues.

[¶ 12] The district court recognized this conflict and applied the statute to resolve which presumption should control. GDK argues that the court's finding is not proper because it improperly considered the children's best interest and the dissolution of the first marriage between TAK and GDK. The propriety of consideration of "best interest of the child" is the subject of many legal articles, a few of which have been previously cited, and of many court decisions.

[¶ 13] Minnesota has a similar statute, which provides that conflicts between statutory presumptions were to be resolved by applying the facts and making a determination as to which conflict was founded on weightier considerations of policy and logic. *In re Paternity of B.J.H.*, 573 N.W.2d 99, 102 (Minn.App.1998). The Minnesota Supreme Court was faced with a similar situation to that present in this case and, after applying the best-interest factors, determined the biological father, not the husband, to be the legal father. *Id.* at 104. The court noted that: Among other things, the respondent wanted a relationship with the child; he was willing and financially able to support the child; the child was accepted by the respondent's family; the respondent no longer wanted a relationship with wife; the child will want to know the identity of his biological father; and even though the child spent the majority of his life with husband, because of his young age he was still able to develop a relationship with the respondent. The court held that adjudicating the respondent to be the father of the child was consistent with the policy of not unnecessarily impairing blood relationships and was logically based on the facts. *Id.* at 103. The court held that a child's best interests are part of the analysis for resolving conflicting paternity presumptions and were consistent with a broad-based method of resolving conflicting paternity presumptions. *Id.* at 102.

[¶ 14] The Colorado Supreme Court, faced with a similar problem, also came to the conclusion that the best interests of the child must be of paramount concern throughout a paternity proceeding and, therefore, must be explicitly considered as a part of the policy and logic analysis that is used to resolve competing presumptions of fatherhood. *N.A.H. v. S.L.S.*, 9 P.3d 354, 357 (Colo.2000).

[¶ 15] Wyoming has traditionally followed the rule that the best interests of the children are generally not relevant in paternity cases. *See Matter of Paternity of TS*, 917 P.2d 183, 186 (Wyo.1996) (A best-interest analysis is not relevant in an inquiry which relates solely to establishing paternity); *TL ex rel. TL v. CS*, 975 P.2d 1065, 1068 (Wyo.1999) (best interest of the child not relevant in an action purely to establish paternity). However, we have recognized that there are some paternity proceedings where the best interests of the child are an issue. *See NDB*, 35 P.3d at 1228. The distinction between these cases has not been previously discussed, and perhaps the conflict has not been clearly explained. We now hold that in cases involving conflicting statutory presumptions, courts must consider the best interests of the child as one factor in determining paternity. To clarify, if the action involves solely a determination of paternity where there are no competing fathers, best interests of the child do not come into play; however, when the determination of paternity involves broader policy consideration, such as conflicting statutory

presumptions, a best interest analysis is not only relevant but unavoidable.

[¶ 16] Although the district court did not specifically use the term "best interest of the child," it is clear that the analysis was focused on this issue. The district court first noted that the six-month limitation under Wyo. Stat. Ann. § 14–2–104(c) (LexisNexis 2001) did not apply to those men alleging paternity under the "holding out" presumption; since JMW also alleged this cause of action, he had the right to assert paternity at any time pursuant to Wyo. Stat. Ann. § 14–2–104(b) (LexisNexis 2001). The court then held that there was substantial evidence to support a finding that JMW had taken both DDK and MK into his home and held them out as his natural children. GDK does not seriously contest this finding. We will follow the well-established rule that the finding of the trier of fact is to be accorded great deference, and we find that there is substantial evidence to support this finding. *Schlesinger v. Woodcock*, 35 P.3d 1232, 1238 (Wyo. 2001). The court went to great lengths to point out that JMW was the biological father; that he had established a relationship with both children; and that he was willing to "undertake all responsibilities, financial included, associated with fatherhood." Specifically, the district court found that:

> However, the tenuous proposition of legitimacy recognized in this family cannot, under the facts and circumstances of this case, overcome the presumptions of paternity built on biological, physical and emotional evidence of a willingness to father this young [child].

[¶ 17] The district court's analysis also discussed the fact that GDK and TAK were married at the time of the birth of the two children. The court did not elaborate on this except to point out that GDK and TAK divorced after she left JMW and then remarried. It is clear that the district court determined that the best interest of the children favored the declaration of JMW as the father, and that this would have little impact on the family unit.

[¶ 18] The court found that JMW would be the best father, and we will not second-guess this decision. GDK argues, however, that this decision has the effect of making the children illegitimate, and this is contrary to best policy and not in the best interest of the children. This Court does not believe that GDK's concerns about the impact on the children of an implied illegitimacy are well-founded. Scholars have noted that the rate of divorce, although dropping slightly since the 1980's, is still high; and it has been predicted that 65 percent of all new marriages will end in divorce. Glennon, *supra* ¶ 11, at 559. As a result of the divorce rate and the increasing propensity of divorced persons to have subsequent relationships without the benefit of marriage, nearly 40 percent of all minor children will experience the divorce of their parents, and by the time they reach majority, one-half will have spent some time in a single-parent household. Stephen J. Bahr, *Social Science Research on Family Dissolution*, presented at the conference "ALI Family Dissolution Principles: Blueprint to Strengthen or Deconstruct American Families?", J. Reuben Clark School of Law, Brigham Young University (February 1, 2001). Another study suggests that "[c]lose to a majority of children growing up today are likely to spend some time living in a single-parent family before reaching adulthood." Frank Furstenberg, *History and Current Status of Divorce in the United States*, Children and Divorce, Vol. 4, No. 1, at 30, 34 (1994). Our society is changing, and some believe that this cultural change is progressing rapidly. Among these changes are an increasing divorce rate, a decreasing rate of remarriage after divorce, and an increasing number of children born out of wedlock. Given all of these factors, there is substantially less adverse impact on children in single-parent homes and substantially less stigma for a child whose parents are not married. The district court's lack of concern about elevating the "marital" presumption reflects the impact of these cultural changes, and this Court can find no reason to disagree. The strong policy of legitimacy that attends the marital presumption as set out in *LC v. TL*, 870 P.2d 374, 380 (Wyo. 1994), has diminished with the changes in societal values discussed herein.

[¶ 19] The Court agrees with the decision of the district court. There are two men, each seeking an adjudication of paternity, and the statutory presumptions asserted by each man must be resolved by considering the "weightier considerations of policy and logic." The use of the term "policy" by the legislature clearly implies that a court should consider the broader sociological and psychological ramifications of its decision as to which man should be adjudicated the legal father. It is inescapable that the best interests of the child must be considered in making a determination as to which of the competing presumptions controls. JMW is not a stranger to the children. He has developed a relationship with them; he has indicated his willingness to support them, both financially and emotionally; and he has demonstrated a commitment to the children. The district court did not err when it considered these factors and when it considered the best interests of the children in making its decision.

[¶ 20] Finally, the Court will also affirm the ruling as to the other child, MK, for the reasons set forth below. It is clearly in the interests of both children that since they have the same biological father, both the district court and this Court should recognize that reality and not adjudicate a different legal father for each child. The district court's ruling as to DDK is affirmed.

## MK ANALYSIS

[¶ 21] The discussion of the paternity of MK is not as complex. All of the reasoning of the district court that resulted in the court's determination that JMW was DDK's legal father also applies to MK. In addition, JMW made a timely request to establish paternity as to MK. A paternity test ordered by the district court also showed a 99.9% probability that JMW was MK's biological father. At the time of this action, Wyo. Stat. Ann. § 14–2–109(e)(iv) (LexisNexis 2001) set out that the results of the paternity test created a presumption that could be rebutted only by clear and convincing evidence. The district court noted that the genetic test was undisputed. The record supports this finding. GDK argues that the marriage presumption trumps and that these tests should not be used to overcome a "presumption of legitimacy." This argument runs counter to the express mandate of the legislature that such test results can only be overcome by clear and convincing evidence. The advances in technology with the attendant increase in the reliability and accuracy of genetic testing and the cultural and societal changes discussed previously indicate that biological ties are increasingly being recognized as having priority, in appropriate cases, even over the marital presumption.

[¶ 22] Acceptance of the argument advanced by GDK would have the law determine that one man is the legal father of the child even though blood tests—the reliability of which is not challenged—determine conclusively that another is the biological father. In his dissent in *Commonwealth ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A.2d 451, 455 (1957), Justice Chidsey aptly noted: "To hold that a 'presumption' *establishes* a fact 'in the eyes of the law' is not only to look upon justice as blindfolded, but to blind her by the law's own hand."

[¶ 23] If we were to hold that we should substitute a legal fiction (that GDK, as the husband, is presumed to be the legal father) over an established scientific fact, it would present problems for the child as well as for the biological father. The child has important rights, including the right to know and spend time with the father. Other rights include the child's interest in the father's lineal descent and the ramifications for medical treatment purposes; inheritance issues; and allaying the psychological stress of the uncertainty of parentage. Again, the Court must consider the best interests of the child.

## CONCLUSION

[¶ 24] The district court was faced with a complex and deeply unsettling problem. There is no authority in Wyoming for dual paternity; therefore, the legal declaration of one man as the father could come only at the expense of the other. The court gave careful consideration to the evidence that was presented and to recognized societal norms. The district court's decision is supported by the record and by a thoughtful legal analysis.

This Court agrees with the result reached. Rather than severing an existing parental relationship, the order finding JMW to be the children's biological father simply confirms and gives legal effect to a relationship known to all the parties. Accordingly, the district court's order declaring JMW to be the biological father simply provides legal substance to a relationship that has existed throughout the children's lives. Under these facts, determining that JMW's parentage claims are weightier than GDK's does not impermissibly interfere with any rights GDK may have stemming from his marriage to TAK. We affirm the decision of the district court.