(324 P.3d 310)
No. 110,194

EMILY L. GREER, a minor child, by and through her next friend, JOHN FARBO, *Appellant*, v. DANA GREER and JACK GREER, *Appellees*.

Opinion filed April 18, 2014.

*John A. Boyd*, of Green, Finch & Covington, Chtd., of Ottawa, for appellant.

*Joyce Hendrix-Kuchar*, of Bezek, Lowry & Hendrix, of Ottawa, for appellees.

Before ARNOLD-BURGER, P.J., MCANANY, J., and ERNEST L. JOHNSON, District Judge Retired, assigned.

ARNOLD-BURGER, J.: When the court is faced with two conflicting presumptions of paternity in a paternity case, it is required to conduct a hearing to determine which presumption "is founded on the weightier considerations of policy and logic, including the best interests of the child," before it determines the child's legal parentage. K.S.A. 2013 Supp. 23-2208(c). In October 2012, Dana Greer (Dana) gave birth to a baby, Emily. Dana was married to Jack Greer (Jack) at the time of the baby's conception and birth; however, voluntary genetic testing after the baby's birth revealed that John Farbo (John), a man Dana dated while she and Jack were separated, is Emily's biological father. Based on the genetic test, John filed a petition in district court to establish himself as Emily's legal father. Because the district court failed to weigh the conflicting presumptions of paternity—legitimacy versus genetics—we find that the court committed an error of law, and, accordingly, we remand the case for such a hearing.

## FACTUAL AND PROCEDURAL HISTORY

Jack and Dana married in 2009. After a time, the couple began to experience marital discord, and in August 2011 they separated. Dana moved in with her father, and Jack obtained a divorce attorney and filed for divorce in Missouri.

Shortly after the separation, Dana contacted her long-time acquaintance John and the two entered into a dating relationship. Although John discovered early in the relationship that Dana was married, Dana assured John that she and Jack planned on divorcing. As the relationship progressed, John and Dana discussed a variety of long-term plans, including living together as a family unit with Dana's daughter from a previous relationship. John moved from Illinois to Kansas during this time. But in February 2012, Jack and Dana reconciled, and Dana ended her relationship with John.

A few weeks later, in March 2012, Dana contacted John and informed him that she was pregnant. John assumed the child was

his and informed Dana that he wished to be part of the child's life and help support the child financially.

The child, Emily, was born in October 2012. John discovered the fact of Emily's birth a few weeks later, as his contact with Dana during her pregnancy was inconsistent and Dana had not informed him of Emily's birth. In January 2013, John, Dana, and Emily underwent genetic testing that determined there was a 99.99% probability that Emily was in fact John's biological child. Based on the genetic testing, John filed a paternity suit in Franklin County to establish Emily's legal paternity. In his petition, he asked the court, pursuant to *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), "for a hearing to determine it is in the best interests of the minor child to determine paternity [and] to make a finding that petitioner is the natural father." In his proposed findings of fact, he enumerated the nonexclusive factors under *Ross* that the court should consider in deciding the case. He proposed findings of fact which corresponded to the *Ross* factors. He proposed that the court conclude:

"Pursuant to the *Ross* case, the Court has determined it is in the best interests of the minor child for the evidence of the genetic testing in this case to be received into court, which establishes with a 99% certainty that the Petitioner is the biological father of the minor child, Emily Greer."

The district court scheduled a *Ross* hearing to determine Emily's best interests prior to establishing paternity.

The *Ross* hearing occurred on June 3, 2013. John, Dana, and Jack each testified. Although other relevant facts will be added as needed, a brief overview of the hearing is as follows:

John testified that, in the time between Emily's birth and the hearing, he had seen Emily approximately 22 times. These visits occurred during time periods in which Jack was temporarily living away from the Greer residence. John explained that during visits he had helped Dana and Dana's older daughter care for Emily and had attempted to establish a parental bond with the baby. John also testified that he had purchased a number of items for Emily and set up a room for Emily in his home. He gave Dana a few items, such as a stroller and car seat, to help her care for the baby.

John further stated that he bought formula and diapers for Emily and paid for at least one doctor's visit, although he admitted he never sent Dana money.

Dana did not counter John's version of events in her testimony. However, Dana noted that she felt pressured by her family and John to involve John in Emily's life. Dana acknowledged that she blocked John's phone number because he continued to contact her even after she asked him to stop. Regarding her marriage to Jack, Dana testified that although she and Jack were estranged twice after Emily's birth, they had started seeing a marriage counselor to work on their relationship. Dana emphasized that Jack coparented Emily with her and that, since Emily's birth, Emily and Jack had formed a strong father-child bond. Dana also stated that although she believed Jack's relationship with Emily would not suffer if Emily knew her biological parentage, she worried that forcing a relationship between John and Emily might confuse Emily unnecessarily.

Jack briefly testified, explaining that most people in the community and his personal life understand Emily to be his child. Jack explained that he wanted Emily to grow up in his home as his child and that he wanted John to stop "interfering" with his family. However, he also acknowledged that his feelings about Emily would not change were John part of her life.

After John's attorney closed his argument, the district judge asked the following question:

"The briefs which I received, which were good, were on the issue of the *Ross* hearing, which we're having today, which is whether it's in the best interest of the child for the court to admit the evidence of the genetic testing. I would determine that it is in the best interest of the child to admit the genetic testing, don't we need to have another hearing or at least—maybe not any additional evidence, but another determination by the court as to which presumption, the presumption of that the child was born during the course of the marriage of the Greers or the presumption that the child, you know, that is 97 percent plus genetically the child of Mr. Farbo. Don't I need to resolve those presumptions at some point in time? There hasn't been any really authority or evidence presented on that."

The attorneys appeared to agree that the district court first needed to determine whether consideration of the genetic testing was in

Emily's best interests and then, if such consideration was in her best interests, decide which man should be adjudged her legal father.

When the district court reconvened on June 6, 2013, to issue its decision, it began by considering the factors traditionally applied to a *Ross* hearing. After determining that the factors balanced equally between Jack and John, the district judge explained:

"[B]ased on the evidence that's been presented in this case and the snapshot I have of the situation and my judgment, and judging the demeanor and the evidence and so forth and the testimony of everybody involved, I would think that the overall best interest is that—the guardian ad litem I think had a good point that although if I would grant the petition for paternity and moving forward the child would have, Emily would have two fathers, that that might start out as a normal situation or that that would be her paradigm of being normal, that she doesn't really need to have two fathers, and I think I agree with that rationale. A lot of these cases come up, as counsel knows, that we don't—we either have just one strong candidate or no candidates; we're trying to find somebody to be a father. In this case, we've got two strong candidates."

However, the district court ultimately found that, based on both the evidence and Kansas caselaw, considering the genetic test results was not in Emily's best interests. Based upon that finding, the district court went on to find that all the court was "left with is the presumption of paternity that this child was born of the marriage of Dana Greer and Jack Greer. So that will be the finding and order of the court." The district court then dismissed the paternity action.

## ANALYSIS

On appeal, John raises three claims: first, the district court erred in determining that admitting the genetic test result was contrary to Emily's best interests; second, the district court erred in conducting a *Ross* hearing; and third, the district court unconstitutionally infringed on John's fundamental right of parenthood by dismissing the paternity petition. John's second argument—that is, whether conducting a *Ross* hearing was proper—raises a possible error of law. But John failed to raise this issue at the district court level and he did not explain his reasons for that failure in his appellate brief. However, as this issue is one of first impression in

Kansas and consideration of this theory is necessary to both serve the ends of justice and to prevent the denial of fundamental rights, this court will consider it for the first time on appeal. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 1778 (2009). In addition, it is virtually inseparable from John's first issue, which is whether the genetic test results should have been admitted.

## THE *ROSS* HEARING AND ADMISSION OF THE GENETIC TEST RESULTS

John contends that the district court erred in conducting a *Ross* hearing. John bases this contention on the premise that because the genetic test establishing him as Emily's biological father existed prior to the paternity action, it also established a presumption in his favor. John acknowledges that under the Kansas Parentage Act (KPA), K.S.A. 2013 Supp. 23-2201 *et seq.*, a presumption exists in Jack's favor as well however, John argues that the proper procedural mechanism was not to conduct a *Ross* hearing and exclude the genetic test results but rather to weigh the conflicting presumptions as provided in K.S.A. 2013 Supp. 23-2208(c).

*Standard of review*

This court exercises an unlimited review over questions of law and a district court's conclusions of law. See *City of Wichita v. Denton*, 296 Kan. 244, 255, 294 P.3d 207 (2013).

*We examine the law regarding presumptions of paternity*

A paternity proceeding determines who a child's legal father is and, therefore, who will enjoy the rights and responsibilities of legal parenthood. Presumptions of paternity may simultaneously arise in favor of different men. In family law, "[t]here is a strong presumption that a woman's husband is the father of any child born during the marriage." 6 Rutkin, Family Law and Practice § 63.02[5] (2013). This presumption exists both at common law and statutorily. 1 Elrod and Buchele, Kansas Family Law § 7.12 (1999). In Kansas, the statute specifically reads: "A man is presumed to be the father of a child if . . . [t]he man and the child's mother are, or have been, married to each other and the child is born during

the marriage." K.S.A. 2013 Supp. 23-2208(a)(1). However, this presumption—also sometimes referred to as the presumption of legitimacy—can, like any other presumption, be rebutted. See K.S.A. 2013 Supp. 23-2208(b).

But the presumption of legitimacy is not the only statutory presumption in Kansas. See K.S.A. 2013 Supp. 23-2208(a). In fact, five other presumptions exist in Kansas, including those that arise when "[t]he man notoriously or in writing recognizes paternity of the child" and when "[g]enetic test results indicate a probability of 97% or greater that the man is the father of the child." K.S.A. 2013 Supp. 23-2208(a)(4), (a)(5). Additionally, many of the criteria that tend to establish these presumptions overlap, meaning that "[m]ore than one man may be presumed to be the father." 1 Elrod and Buchele, Kansas Family Law § 7.15 (1999). Therefore, in the case of conflicting presumptions, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2013 Supp. 23-2208(c). A presumption "may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man," or as provided by the section of the statute regarding conflicting presumptions. K.S.A. 2013 Supp. 23-2208(b).

*We examine the* Ross *case*

Because the district court relied on the *Ross* case to find that admission of the genetic test establishing John as the biological father of Emily was not in Emily's best interests and, therefore, the only remaining presumption was the legitimacy presumption, it is important to review the *Ross* case.

During the marriage of Sylvia and Robert Ross, a child was born. When the couple subsequently divorced, Sylvia was given custody of the child, and Robert was given visitation rights and ordered to pay child support. He was later given joint custody. Sylvia subsequently remarried and was interested in her new husband adopting the child. Two years after her divorce from Robert, Sylvia filed a paternity action under the KPA claiming that Charles, a man she had a sexual relationship with around the time of the child's con-

ception, was the father. Charles had no interest in parenting the child, and he and Sylvia had already discussed whether he would be amenable to relinquishing his parental rights and allowing Sylvia's new husband to adopt the child if it was determined that he was the father. After filing her action, Sylvia asked that genetic testing be ordered by the court. A guardian ad litem was appointed, and the guardian filed a separate paternity action on behalf of the child. The district court dismissed Sylvia's action, apparently on the basis of res judicata and equitable estoppel related to the prior divorce decree, but the court allowed the action to proceed through the guardian ad litem. The court then sustained the guardian ad litem's request for a blood test without a hearing.

The court subsequently conducted a hearing to determine paternity but only allowed evidence regarding the child's biological parentage. The court did not accept any evidence regarding the best interests of the child. Charles was determined, by clear and convincing evidence, to be the biological father of the child. Charles was ordered to pay child support, but the court maintained joint custody of the child between Sylvia and Robert, finding that Robert stood in loco parentis.

The Kansas Supreme Court found that the district court abused its discretion by admitting the blood test results without first having a hearing as to whether such testing was in the child's best interests. The court specifically rejected the notion that if blood testing proves the presumed father to be the biological father, the issue of parentage is closed and the necessity for extended evidence as to the child's best interests is precluded. 245 Kan. at 601. The Supreme Court reversed the district court's order for blood tests and restored the parties to their positions before the tests were ordered. It ordered the district court to conduct a hearing purely based upon the best interests of the child and not to consider the blood tests "until such consideration is determined to be in [the child's] best interest." 245 Kan. at 602.

A review of the statute in effect at the time of *Ross* is critical to understanding the court's analysis. The statute listed several presumptions of a paternity. Applicable to the *Ross* case was the presumption of legitimacy contained at K.S.A. 38-1114(a)(1) (Ensley

1986) and the fact that Robert had notoriously or in writing recognized his paternity under K.S.A. 38-1114(a)(4) (Ensley 1986). The *Ross* court noted that not only were the parties married, but Robert

"acknowledged his paternity of the child in writing; with his consent, he was named as the father on the child's birth certificate; he willingly became obligated to support the child in the divorce decree; and he notoriously and in writing recognized his paternity of the child to the district court." 245 Kan. at 595.

The statute went on to state that these presumptions were rebuttable by clear and convincing evidence. K.S.A. 38-1114(b) (Ensley 1986). There were no conflicting presumptions in *Ross*. There were only two presumptions, both favoring Robert.

Although genetic testing was allowed and could be offered into evidence at the time, it had not yet been elevated to the level of a presumption. K.S.A. 38-1119(a)(4) (Ensley 1986). The statutes did require a court, either on its own motion or on the motion of any party, to order blood tests "[w]henever the paternity of a child is in issue." K.S.A. 38-1118 (Ensley 1986). But because the shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child, the Kansas Supreme Court found that prior to ordering a paternity test the court must conduct a hearing to determine the best interests of the child, including the child's physical, mental, and emotional needs. *Ross*, 245 Kan. 591, Syl. ¶ 5.

We note that "the best interests of the child" standard did not appear anywhere in the KPA at the time of the *Ross* decision. Instead, the court found that "[t]he Uniform Parentage Act clearly was designed to provide for the equal, beneficial treatment of children. In this regard, it requires courts to act in the best interests of the child when imposing legal obligations or conferring legal rights on the mother/child relationship and the father/child relationship." 245 Kan. at 597.

*We examine the statutory scheme since* Ross

The applicable provisions of the KPA have changed dramatically since *Ross* and, perhaps in part, in response to it. In 1994, the legislature elevated genetic test results to a presumption of pater-

nity. It also included the "best interests of the child" as a consideration when weighing competing presumptions. L. 1994, ch. 292, sec. 5. The 1994 legislature also specifically provided that "[p]arties to an action may agree to conduct genetic tests prior to or during the pendency of any action for support of a child." L. 1994, ch. 292, sec. 8. The legislative changes further required that the written report of genetic test results be admitted into evidence without the need for further foundation if there is not an objection lodged in the manner provided in the statute. L. 1994, ch. 292, sec. 8.

This court first recognized these legislative changes in *In re Estate of Foley*, 22 Kan. App. 2d 959, 962, 925 P.2d 449, *rev. denied* 261 Kan. 1085 (1996), and held, consistent with *Ross*, that in order for a presumption of paternity to exist, the facts necessary to prove that presumption must exist *before* the paternity action is filed. See also *Roy v. Edmonds*, 45 Kan. App. 2d 1156, 1161-62, 261 P.3d 551, *rev. denied* 293 Kan. 1107 (2011). Similarly, in a case involving the guardianship and adoption of a minor, this court noted that the statutory presumption of paternity in what is now K.S.A. 2013 Supp. 23-2208(a)(5) arose "as soon as Father filed the genetic testing results with the district court." *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 697, 251 P.3d 651, *rev. denied* 292 Kan. 964 (2011).

Based upon the current statutes and caselaw, if there is not a genetic test in place at the time the action is filed and a party requests that one be performed, the order for genetic testing must be based on a determination, after a hearing, that such a test is in the best interests of the child. But if the testing is completed before the case is filed, the presumption is elevated to a legal, albeit rebuttable, presumption. These statutory changes remain in the law to this day and are codified at K.S.A. 2013 Supp. 23-2208(a)(5) (genetic test results can create a presumption of paternity), K.S.A. 2013 Supp. 23-2208(c) (best interests of child considered when weighing two or more presumptions), and K.S.A. 2013 Supp. 23-2212 (genetic tests may be conducted prior to filing case, and report of results must be admitted unless timely objection lodged). It is because of these changes that the decision in *Ross* does not

control the procedure required of the district court in this case—or, more importantly, the outcome of this case.

Since *Ross* was decided, most cases invoking a *Ross* hearing also involve facts very similar to *Ross*: a party attempts to challenge a long-standing presumption *prior* to any genetic testing of the parties by filing a paternity action. See, *e.g.*, *In re D.B.S.*, 20 Kan. App. 2d 438, 440-42, 888 P.2d 875, *aff'd* 258 Kan. 396, 903 P.2d 1345 (1995). Only one Kansas case involves genetic testing that predated the filing of the paternity action; there, the district court refused to admit the testing based on its lack of scientific validity, not based on the *Ross* factors. See *Guth v. Wagner*, No. 103,398, 2010 WL 2978091, at *8-9 (Kan. App.) (unpublished opinion) (upholding district court's decision to exclude a DNA test purchased over the counter at Walgreens because it "would not pass the test for admissibility of expert scientific evidence"), *rev. denied* 291 Kan. 912 (2010). In *Guth*, this court recognized the post-*Ross* statutory provision that allows parties to agree to conduct genetic testing before the pendency of an action and admit a verified written report of the results. 2010 WL 2978091, at *9. This court also recognized the detailed guidelines contained in the statute for objecting to those results. Although the record did not contain any evidence that an objection to the test results had been filed pursuant to the statutory procedure, it held:

"There is no written objection to admission of the report in the record on appeal. However, there is also no evidence that Guth ever attempted to admit a *verified* written report of the genetic test results, or that Conrad ever received a verified written report 10 days before the hearing, and no evidence that all parties agreed to conduct genetic tests before Guth filed this action. See K.S.A. 38-1118(b)-(c). Consequently, the genetic test result[s] completed before this paternity action was filed was inadmissible. Accordingly, the district court did not err in excluding the genetic test results." 2010 WL 2978091, at *9.

In summary, our Supreme Court's mandate in *Ross* continues to be good law. See *Reese v. Muret*, 283 Kan. 1, 6, 150 P.3d 309 (2007). But the caselaw and statutory changes since *Ross* make it clear that a *Ross* hearing is only required in two very specific situations: when (1) there is not a genetic test resulting in a presumption of paternity performed prior to the filing of the paternity

action, or (2) a genetic test was completed prior to the filing of the paternity action but the result is inadmissible due to a proper statutory objection being lodged. In addition, *Ross* would only apply when one man's presumption is at risk of rebuttal; when "no credible evidence exists that child has a presumed father," a *Ross* hearing in advance of admitting a genetic test results is not required. See 1 Elrod and Buchele, Kansas Family Law § 7.15 (2013 Supp.).

*We apply the law to the facts*

Under the current statutory scheme, and the one in place at the time of this paternity action, the district judge was faced with two competing presumptions: legitimacy and genetic. K.S.A. 2013 Supp. 23-2208(a)(1) and (5). Both presumptions were in place prior to the filing of the paternity action. The court was required to admit and consider the genetic test results because no objection was lodged as required by K.S.A. 2013 Supp. 23-2212(c). In addition, and unlike in *Guth*, the parties agreed to genetic testing, and a copy of the report was filed with the court at the same time as the petition to determine paternity. During the hearing, no one disputed the test results and the fact that John was Emily's biological father. A *Ross* hearing to determine whether to *consider* the test results was not required because, given the posture of the case and the lack of objection, the court was required to consider the test results as one of the presumptions of paternity. The court did not disregard the test results due to any concerns about its validity; its validity was not in question. Instead, the court disregarded the test results totally on a *Ross* "best interests of the child" analysis. By not considering the genetic test results, the district court committed an error of law.

Additionally, the district court was required to weigh the competing presumptions and find in favor of the presumption "founded on the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2013 Supp. 23-2208(c). The district court failed to weigh competing presumptions because it refused to even consider one of the presumptions. This is also an error of law.

We pause here to note that the district court recognized that a future weighing of presumptions may be necessary. In fact, the judge alluded to the need for a future hearing if the test results were admitted and noted that there had not been any evidence presented regarding the weight of the competing presumptions. But the court was erroneously guided by both parties. In response to the judge's concerns about the need for a future hearing to weigh the competing presumptions, the parties advised him that he only had to conduct such a hearing if he found it was in Emily's best interests to admit the test results. Both parties erroneously believed that such a procedure was mandated by *Ross*.

The obvious concern is whether any error in applying *Ross* was invited. "A party may not invite error and then complain of that error on appeal." *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003). But invited error is a judicially created rule and, as such, it "should be tailored as necessary to serve its particular purpose without unnecessarily thwarting the ends of justice." *State v. Hargrove*, 48 Kan. App. 2d 522, 553, 293 P.3d 787 (2013). John should not be deemed to have invited error by joining the other parties to the litigation and the trial judge in misinterpreting the court's statutory authority. See *State v. Horn*, 291 Kan. 1, 9-10, 238 P.3d 238 (2010). A court cannot abdicate its duty by relying on the stipulation of the parties that a certain procedure is required, particularly if the stipulation is contrary to statute. See In *re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 16-17, 687 P.2d 603 (1984). Here, the procedure advanced by the parties was contrary to the clear statutory language.

At the conclusion of the *Ross* hearing, the district court found that upsetting Jack's presumption of legitimacy was not in Emily's best interests and, accordingly, dismissed the paternity action without considering the genetic test results. Although the court spoke to Emily's best interests, the judge's failure to recognize both competing presumptions, legitimacy and genetic, and then conduct the weighing of presumptions was the cause of the error we have found here.

Accordingly, we reverse the decision of the district court and remand the case for a hearing for the district court to weigh the

two competing presumptions as required by K.S.A. 2013 Supp. 23-2208(c).

*We provide guidance in weighing the conflicting presumptions and the best interests of the child*

Because this is a matter of first impression in Kansas, there are no cases guiding a court in weighing competing presumptions, although there is some guidance in determining the best interests of the child. We briefly review those factors here to provide future guidance when courts are faced with competing presumptions.

### *The weightier considerations of policy and logic*

The KPA does not designate any one presumption as conclusive, and K.S.A. 2013 Supp. 23-2208(c) requires that when presumptions conflict, "the presumption which on the facts is founded on the *weightier considerations of policy and logic*, including the best interests of the child, shall control." (Emphasis added.)

A few courts around the country have tried to parse the *considerations of policy and logic* language. The Wyoming Supreme Court noted that this language is not only limited to legal policy but "clearly implies that a court should consider the broader sociological and psychological ramifications of its decision as to which man should be adjudicated the legal father." See *GDK v. State, Dept. of Family Services*, 92 P.3d 834, 839 (Wyo. 2004). The Minnesota Court of Appeals observed that the statutory language embraces "the policy of not unnecessarily impairing blood relationships" and requires that the outcome be "logically based on the facts." *In re Paternity of B.J.H.*, 573 N.W.2d 99, 103 (Minn. App. 1998). Appropriately, the *policy and logic* portion of the inquiry appears in part to be heavily based on a state's individual caselaw and policy. See *Ex parte C.A.P.*, 683 So. 2d 1010, 1011-12 (Ala. 1996) (weighing presumptions by relying heavily on Alabama precedent).

Several courts, including those in Kansas, have specifically referred to the strength of the presumption of legitimacy. See *Ross*, 245 Kan. at 596 ("the ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known

to the law"). The *Ross* court emphasized that if a blood test proves the presumed father is the biological father, the issue of parentage is not closed. "Though such reasoning promotes judicial economy, it is contrary to our longstanding public policy that a child born during a marriage should not be bastardized." 245 Kan. at 601. The district court is still required to consider the best interests of the child. 245 Kan. at 601; see also *Ex parte C.A.P.*, 683 So. 2d at 1012 (presumption of legitimacy is weightier than other statutory presumptions); *N.A.H. v. S.L.S.*, 9 P.3d 354, 360 (Colo. 2000) (strong public policy supports the presumption of legitimacy).

Our Supreme Court has also recognized, in an adoption proceeding, the important rights of biological fathers who promptly assert their rights by taking affirmative steps to show they are fully committed to accepting parenting responsibilities.

"A natural parent's right to the companionship, care, custody, and management of his or her child is a liberty interest. The liberty interest of a natural parent has its origin in the biological connection between the parent and child, but a biological relationship does not guarantee the permanency of the parental rights of an unwed natural father. Rather, the significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. The opportunity is lost, however, if the natural father does not come forward to demonstrate a full commitment to the responsibilities of parenthood." *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 3, 196 P.3d 1180 (2008), *cert. denied* 556 U.S. 1184 (2009).

The West Virginia Supreme Court noted that *both* marriage to the child's mother and "factual, biological parentage" are weighty factors. *State ex rel. v. Michael George K.*, 207 W. Va. 290, 299, 531 S.E.2d 669 (2000).

Interestingly, K.S.A. 60-415 is the only other place in Kansas statutes where this language is used, and it states:

"If two presumptions arise which are conflicting with each other the judge shall apply the presumption which is founded on the weightier consideration of policy and logic. If there is no such preponderance both presumptions shall be disregarded."

In the case of a paternity action, if both *presumptions* were disregarded, the child would be left without a presumptive father at all, defeating the entire purpose of the KPA. Accordingly, the judge

in a paternity action must make the difficult choice while always including the overarching consideration of the best interests of the child in the equation.

### The best interests of the child

Over the years, courts have distilled the best interests of the child consideration present in paternity cases to include approximately 10 factors. 1 Elrod and Buchele, Kansas Family Law § 7.15 (1999). These factors have been summarized as including: (1) whether the child thinks the presumed father is his or her father and has a relationship with him; (2) the nature of the relationship between the presumed father and child and whether the presumed father wants to continue to provide a father-child relationship; (3) the nature of the relationship between the alleged father and the child and whether the alleged father wants to establish a relationship and provide for the child's needs; (4) the possible emotional impact of establishing biological paternity; (5) whether a negative result regarding paternity in the presumed father would leave the child without a legal father; (6) the nature of the mother's relationships with the presumed and alleged fathers; (7) the motives of the party raising the paternity action; (8) the harm to the child, or medical need, in identifying the biological father; (9) the relationship between the child and any siblings from either the presumed or alleged father; and (10) whether there have been previous opportunities to raise the issue of paternity. 1 Elrod and Buchele, Kansas Family Law § 7.15 (1999).

"Time may be a major factor" in determining best interests, as well as "the notoriety of the child's situation in the community," the stability of the home in which the child will reside, the child's uncertainty regarding the paternity issue, "and any other factors that will maximize the child's opportunities for a successful life." 1 Elrod and Buchele, Kansas Family Law § 7.15 (1999 & Supp. 2013); see also *Paternity of B.J.H.*, 573 N.W.2d at 102-03 (whether the presumed father introduced the child to his extended family; whether the presumed father intended to continue a relationship with the mother (not his wife), whether the child would want to know the identity of the presumed father; whether the child's

young age allowed for development between the child and the presumed father, and the opinion of the guardian ad litem and any experts); *Michael George K.*, 207 W. Va. at 298 (speed with which each presumed father acted in asserting or denying paternity); *GDK*, 92 P.3d at 838 (effort of the presumed father to establish a relationship with the child and to undertake all parental responsibilities—including financial, physical, and emotional responsibilities—and effect favoring one presumption over another might have on an existing family unit).

However, most courts also recognize that a best interests analysis is incredibly fact-specific and rarely limited to a narrow number of factors. In *N.A.H. v. S.L.S.*, 9 P.3d at 363, the Colorado Supreme Court observed that "the whole paternity proceeding [is intended] to be about the best interests of the child." This focus is in part because "[t]he outcome of a paternity action irrevocably alters a child's current family situation and her future." 9 P.3d at 364. Accordingly, it is clear that courts weighing two or more conflicting presumptions may consider a wide array of nonexclusive factors when deciding which presumption serves the child's best interests.

Because we reverse the district court's decision and remand for a hearing for the district court to properly determine which presumption "is founded on the weightier considerations of policy and logic, including the best interests of the child," we need not address the balance of the issues presented.

Reversed and remanded with directions.