NOT DESIGNATED FOR PUBLICATION

No. 124,696

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of C.R.

MEMORANDUM OPINION

Appeal from Atchison District Court; MARTIN J. ASHER, judge. Opinion filed September 30, 2022. Affirmed in part, reversed in part, and remanded with directions.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant P.R.

*John W. Fresh*, of Farris, Fresh & Werring Law Offices, of Atchison, for appellee/intervenor T.K.

Before GREEN, P.J., ISHERWOOD and COBLE, JJ.

PER CURIAM: This is a dispute between two presumed fathers seeking to be declared the legal father of C.R., a child born in 2016. Appellant P.R. was incarcerated when C.R. was conceived and born but was released within a few months after C.R.'s birth. Mother, O.B., knowingly and voluntarily named P.R. on C.R.'s birth certificate and gave him P.R.'s last name, and P.R. established a parental relationship with the child. P.R. is also the natural and legal father of two older children he shares with O.B. During a hearing in 2017, despite P.R. acknowledging on the record that he was not C.R.'s biological father, the district court determined P.R. to be C.R.'s legal father because of their established relationship, the intention of O.B. regarding that relationship, and that O.B. and all the children lived with P.R.'s parents for a period including the time surrounding C.R.'s birth.

P.R. continued in his role as C.R.'s father for almost three years, until another man, J.P., intervened in the action. J.P. claimed to be C.R.'s known biological father, with

1

genetic testing to prove as much, and although he had intermittent contact with C.R. from shortly after his birth to the date of intervention, J.P. contended he had received no notice of the earlier paternity proceeding. The district court set aside its earlier order, conducted a second paternity hearing, and determined J.P. to be C.R.'s legal father. P.R. appeals.

We find the district court was correct to set aside its initial paternity order, albeit for the wrong reasons. The first paternity order was void for lack of subject matter jurisdiction because J.P. as the known, presumed biological father of C.R. was not made a party to the paternity action. See K.S.A. 2021 Supp. 23-2211(a). Because the initial paternity order was void, the district court was then faced with competing presumptions of paternity between P.R. and J.P.

After review of the record, we find the district court's determination of J.P.'s paternity was an abuse of discretion because it failed to properly employ the standard set forth in K.S.A. 2020 Supp. 23-2208(c) to the competing presumptions, and did not fully apply the appropriate legal standard to the facts presented. For these reasons, although we affirm the district court's setting aside of the initial paternity order to the extent the void order has no force and effect, we reverse the district court's decision to designate J.P. the legal father of C.R. and remand this matter for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

This paternity matter involves three claimed parents and their separate extended families over a period of more than four years. As a result, only the facts necessary to the resolution of this matter are recited herein. But suffice it to say, the interactions between all parties—children, parents, and grandparents—are in no way comprehensively documented in this snapshot of the parties' interactions.

Baby C.R. was born to O.B. in June 2016. O.B. was not married at the time of C.R.'s birth, but she had an ongoing relationship with P.R., including having two prior children with him. The older two children are not subjects of this appeal. O.B. and the older children were residing with P.R.'s parents (E.R. and J.R.) at the time of her brief relationship with J.P. and when C.R. was born, because P.R. was incarcerated. P.R. is not the biological father of C.R. and given O.B.'s relationship with J.P., it was known that J.P. was the biological father of C.R. In fact, J.P.'s mother established a relationship with the child within two months of C.R.'s birth.

After P.R.'s release in approximately October 2016, he assumed the role of C.R.'s father. On May 15, 2017, the district court named P.R. as legal father of C.R. during a hearing on a petition filed by O.B. The district court docket reflects service of the paternity petition only on P.R. and no other person. Both O.B. and P.R. were present at this initial hearing. O.B.'s counsel and the district court suggested the hearing was a "*Ross* hearing" pursuant to *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989). The district court explained the hearing was to determine what contacts P.R. had with the child to determine whether or not there should be genetic testing. After hearing formal witness testimony from O.B. and discussion with P.R., who appeared without counsel, the district court found that "even though biologically [P.R. was] not the father, [P.R. was] going to be legally treated as the father." The district court entered a journal entry declaring P.R. to be the father of C.R.

Days thereafter, the district court entered an order acknowledging that although P.R. and O.B. were residing together at that time, O.B. would have primary residential custody of all three children. The court ordered P.R. to have parenting time but did not order child support because the parties were currently living together.

The relationship between O.B. and P.R. was rocky, at best. Within a few months of P.R.'s paternity determination, O.B. and P.R. separated, and the district court ordered

P.R. to show cause why he failed to comply with the district court's orders regarding visitation of C.R. by not returning him at the conclusion of a visit. A few months later, P.R.'s parents, E.R. and J.R., were awarded grandparent visitation with C.R. after the district court acknowledged not only their substantial relationship with C.R., but their physical custody and legal guardianship of C.R.'s two older siblings. P.R. was then incarcerated from October 2017 through March 2018.

Upon his release, P.R. quickly filed a motion to enforce his parenting time. Two weeks later, O.B. filed a motion to suspend P.R.'s parenting time, alleging he was not fulfilling his obligations as a father and lacked a bond with C.R. "due to [P.R.'s] willful and intentional criminal acts that lead to his repeated incarceration." Within two days, E.R. and J.R. filed a motion to enforce their grandparent visitation, claiming O.B. was not complying with the prior district court order. Addressing the pending motions, the court suspended P.R.'s visitation with C.R., with the exception that P.R. could have time with all three children at his parents' home when E.R. and J.R. were exercising their grandparent visitation. The district court noted on the record that because P.R. was living with his parents, he could "consolidat[e] [his] visitation in with their visitation" and this arrangement would permit P.R. to resolve a pending criminal case.

Two weeks after O.B. filed her motion to suspend P.R.'s parenting time, in May 2018—nearly two years after C.R.'s birth—J.P. filed his first motion to intervene as C.R.'s biological father. O.B. did not oppose the motion and the district court granted it. J.P. then filed a subsequent motion seeking to determine his own father and child relationship with C.R. and for relief from the earlier judgment establishing P.R.'s paternity. In his motion, J.P. claimed he did not receive notice of the earlier proceedings, that O.B. and P.R. misrepresented the facts to the court, and that he would have participated in the matter if he had known. About six months later, J.P. withdrew his motion for reasons not explained in the record.

4

This matter remained relatively quiet, in terms of court involvement, from late 2018, after withdrawal of J.P.'s motion, through mid-2019. In mid-2019, P.R. filed a motion to modify custody, but before the motion was heard, P.R. was once again incarcerated and he withdrew his motion. The district court continued to permit E.R. and J.R to exercise grandparent visitation as previously ordered.

By mid-2019, relations between O.B.'s family and P.R.'s family appeared to worsen. In October 2019, T.K., O.B.'s mother, filed a motion to intervene and consent for third party custody, with O.B. consenting to T.K.'s residential custody of C.R. At the time, O.B. and C.R. were living with T.K. intermittently, and T.K. claimed P.R. and his parents were "harassing" her, while P.R. and his parents claimed O.B. and T.K. were not following the visitation orders in place. Months later, T.K. was cited for indirect contempt for failing to permit P.R. and his parents their ordered visitation.

E.R. and J.R., after appearing during court hearings, were directed by the district court to formally intervene in the case. A formal motion does not appear in the district court record on appeal and E.R. and J.R. are not listed in the caption of district court documents as intervenors. However, E.R. and J.R. are noted in the appellate proceedings as intervenors.

A flurry of activity occurred in February 2020. O.B. was reportedly "in the wind" and C.R. was living full-time with T.K. The district court permitted P.R. only biweekly visitation supervised by a Court-ordered Special Advocate (CASA) and did not allow him to be present during his parents' monthly weekend visitation for reasons unclear in the record. Exchanges for grandparent visitation were to occur only at a law enforcement station. T.K. was granted temporary residential custody of C.R.

This same month, with maternal grandmother T.K. and legal paternal grandparents E.R. and J.R. squaring off for battle, J.P. reentered the scene by filing a renewed motion

5

to determine a father and child relationship, asserting identical reasoning to the motion filed a year before.

The district court held a hearing on December 3, 2020, to address a number of issues, including J.P.'s paternity motion, T.K.'s motion to suspend E.R. and J.R.'s grandparent visitation, and various protection from abuse petitions filed by T.K. against P.R., E.R., and J.R. J.P. and P.R. were each incarcerated at that time.

During the portion of the hearing addressing J.P.'s paternity motion, R.F., mother of J.P., testified that J.P. shared time with C.R. as a father and son, and that C.R. recognizes J.P. as a father figure. She testified regarding the history of her contact with C.R., commencing when he was just two months old and continuing through the month prior to the hearing. When R.F. would keep the child for a weekend, which occurred approximately twice per month in the early months, J.P. would see him. At the time of the hearing, the child called R.F. "nana" and called J.P. "daddy". During the hearing, R.F. submitted photos of her family, including J.P., interacting with C.R. over the previous years. R.F. testified that O.B. had a paternity test done in 2018 which showed that C.R. was "[l]ike 99.999 [percent]" J.P.'s child. R.F. also testified that she could not name a time when J.P. had the child alone, without her, "because he doesn't have a car" and it was unlikely he had ever had the child at his own residence alone.

E.R., father of P.R., testified that C.R. had been raised in his home from birth until a month before his first birthday. E.R. testified that he knew P.R. was not C.R.'s biological son, and J.P. was the biological father, and that is why they allowed R.F. to visit the child. E.R. also provided testimony that although O.B. and his family did not always get along, C.R. and P.R. had a family relationship. E.R. explained that O.B. was not always a stable parent, and at times, E.R. and his wife, J.R., would allow C.R. and occasionally O.B. to stay with them. E.R. told the district court that C.R. had spent every Christmas with E.R., J.R., and their family. E.R. also testified that P.R. lived in their

6

home "most of the time" but did live in a house next door in 2019-2020, and C.R. spent time alone with P.R. in that house "a long time." He also testified that although O.B. did not ask for financial support from P.R., he did provide various types of financial support for the benefit of O.B. and C.R., including providing his entire tax return for bills one year, and he "paid weekly on his paychecks" for bills and food while C.R. lived at their home for his first year of life, and during one other year.

P.R. testified to his relationship with C.R. and O.B., and the ongoing effort to have C.R. in his life, despite the difficulty of his time away because of his repeated incarcerations and his unstable relationship with O.B. During one incarceration, he played with C.R. in the parking lot of the jail after work on weekends. P.R. noted he did not have a problem with J.P. or his mother being in C.R.'s life, as "long as [J.P. was] sober". P.R. indicated that he regularly gave his mother half his paycheck to support all three of his children. Although P.R. became confused when cross-examined and could not recall exact dates or time periods where he had regular or continuous contact with C.R., he claimed he has "been a regular in his life, his whole life. And [he] would like to continue that . . .[and] love[s] that boy to death."

J.P. also provided testimony regarding his relationship with C.R. J.P. testified that he has been homeless for an unspecified time, longer than he can remember, and he preferred to be homeless, but he wanted to share time with C.R. whenever he wants and without having to seek anyone's permission. When asked where C.R. might sleep if staying with J.P., he said "[o]utside, inside" and "[w]herever I wanted to make a bed at." J.P. acknowledged his previous time with C.R. was a result of his mother, R.F.'s, involvement, and he has never had C.R. with him alone overnight. J.P. stated he had never provided anyone money for C.R.'s support and was unable to identify which school C.R. attended. During the hearing, the district court questioned whether J.P. understood why he was in court that day, and whether he cared about the determination of whether he was to be in C.R.'s life. J.P. stated he did not understand why he needed the court to

7

determine whether he was a "part of [his] own child's life." He stated he wanted to be part of C.R.'s life and "[didn't] want you all to be part of his life." J.P. testified that O.B. told him she was going to court about C.R. in "probably 2017."

During counsel arguments at the close of testimony, counsel for T.K., who previously represented O.B. in the initial petition in 2016, admitted what troubled him "is the fact that nowhere in [O.B.'s original petition] does it mention [J.P.]", and J.P. did not have an opportunity at the beginning of the case to appear.

The district court, after hearing the testimonies of the parties, set aside the order granting P.R.'s parental rights and declared J.P. to be the father of C.R. The district court held that J.P. was permitted to participate in what it referenced as a "second *Ross* hearing" because he was not given notice and did not have the opportunity to participate in the first paternity hearing. More specifically, the district court found it was in the best interests of C.R. to have a connection with both P.R. and J.P.'s families, and since C.R. has half siblings, whose father is P.R., those relationships will maintain C.R.'s connection with P.R.'s family. However, the district court opined that unless the court permitted J.P.'s legal connection with the child, that side of the family would have no connection. The district court determined J.P. to be C.R.'s legal father and directed the child's last name to be changed and a new birth certificate to be issued.

P.R. appealed. T.K.'s counsel filed a brief which was largely noncompliant with Supreme Court Rule 6.02 (2022 Kan. S. Ct. R. at 35), requiring citations to the record. In T.K.'s brief, she notes C.R. continues to reside with her and contends the district court did not err in allowing J.P. to assert his parental rights and in finding J.P. to be the child's father. No other party—O.B., J.P., E.R. or J.R.—offered argument on appeal.

8

Despite the complexity of the factual history, the legal issues encompassed in this matter are comparatively clearer. Two issues emerge from the briefing: whether the district court properly set aside the 2017 determination of P.R.'s parentage, and the district court's legal basis to conduct the paternity hearing in 2020. These issues are properly analyzed under the Kansas Parentage Act (KPA), K.S.A. 2021 Supp. 23-2201 et seq.

*The first paternity order was void under the KPA*

Under Kansas law, all proceedings concerning parentage of a child are governed by the KPA, except to the extent otherwise provided by the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901 et seq. (2018); K.S.A. 2021 Supp. 23-2201(b). Interpretation of statutes is a question of law over which appellate courts have unlimited review. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 48, 392 P.3d 68 (2017).

P.R. first argues that the district court erred by setting aside the initial order declaring him to be C.R.'s legal father. He analyzes the Kansas Rules of Civil Procedure to claim that the district court did not make adequate findings required by K.S.A. 2021 Supp. 60-260(b) and (c) to set aside the judgment from the first paternity hearing.

P.R. also argues the district court erred by conducting an unlawful second paternity hearing. He specifically claims that the district court could not terminate his vested parental rights granted to him in the first paternity hearing through a subsequent hearing. P.R. frames the issue as a termination of his fundamental rights as a parent, which requires due process. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008); see also *In re X.D.*, 51 Kan. App. 2d 71, 73-74, 340 P.3d 1230 (2014) (right to be legal parent of a child is a fundamental right).

Although P.R. was undoubtedly offered process, given his appearance and opportunity to testify during the second hearing, this court need not reach either his constitutional due process or civil procedure arguments, given the controlling statutory framework of the KPA.

P.R. incorrectly frames the issue as a "termination" of his parental rights and maintains only "[t]wo avenues exist within . . . Kansas Statutes to terminate parental rights." He maintains one such path is through a child in need of care proceeding under K.S.A. 38-2269, and the other is through an adoption proceeding under K.S.A. 2021 Supp. 59-2136. P.R. argues the termination of his parental rights was unlawful because it went through neither of these proceedings. But his theory that only two statutory schemes address parental rights is simply inaccurate. P.R. misses the most obvious statutory scheme hiding in plain sight—the KPA.

And K.S.A. 2021 Supp. 23-2211(a) of the KPA "requires that the child, mother, and each presumed *or alleged* father be made parties to any action. Not joining the proper parties *deprives the trial court of subject matter jurisdiction*." (Emphases added.) *Anderson v. Richard*, No. 112,027, 2015 WL 802759, at *1 (Kan. App. 2015) (unpublished opinion). Although no party raises this issue on appeal, it is incumbent upon this court to review issues of subject matter jurisdiction. The existence of subject matter jurisdiction is a question of law, and the appellate court's review is unlimited. *In re Marriage of Myers*, 30 Kan. App. 2d 1223, 1225, 56 P.3d 1286 (2002).

Here, given P.R.'s incarceration at the time of conception and O.B.'s known relationship with J.P., many people—including O.B., P.R., and apparently numerous others—knew J.P. was assumed to be the biological father of C.R. from at least as soon as the child's birth. Yet J.P. was admittedly excluded by O.B. and P.R. as a party to the original paternity action, despite their admissions on the record in the 2017 hearing that P.R. was not the biological father. Because of this omission, the 2017 paternity order

entered by the district court was simply void, as the district court lacked jurisdiction to enter the order due to the failure of the parties to join the alleged biological father to the action. See *In re Marriage of Myers*, 30 Kan. App. 2d at 1225 ("A void judgment is one rendered by a court lacking personal or subject matter jurisdiction or acting in a manner inconsistent with due process.").

Therefore, P.R.'s arguments regarding the district court's initial paternity determination are for naught, as there was no valid order for the district court to set aside. The district court was correct to "relieve" the parties of the first order establishing P.R.'s paternity—albeit for the wrong reasons, because the original paternity order simply had no legal force or effect. See *In re Estate of Heiman*, 44 Kan. App. 2d 764, 766, 241 P.3d 161 (2010) ("If a court lacks subject matter jurisdiction, its actions have no legal force or effect and cannot bind the parties.).

*The district court erred in its application of the KPA to the facts.*

Having determined the 2017 order of paternity to be void, we must further examine the KPA to discern the proper legal question facing the district court in its 2020 hearing. Again, our interpretation of Kansas statutes is a question of law over which appellate courts have unlimited review. *Smith*, 306 Kan. at 48.

As previously noted by a panel of this court, "[a] paternity proceeding determines who a child's legal father is, and therefore, who will enjoy the rights and responsibilities of legal parenthood." *Greer v. Greer*, 50 Kan. App. 2d 180, 185, 324 P.3d 310 (2014). The appropriate inquiry in 2020 was not whether the first paternity order could be set aside to consider a new presumption of paternity. The proper questions facing the district court were whether competing presumptions of legal paternity existed, and if so, how to properly analyze those presumptions.

11

*The district court's findings*

The district court's written order determining the father/child relationship between J.P. and C.R. included its ruling but no specific factual findings. However, the district judge articulated its findings on the record during the December 3, 2020, hearing:

"I think we can all agree, this is the most unusual circumstances.

"As I stated earlier—stated at the beginning—this is probably the second *Ross* hearing we have had in this, although the first one was not as extended as this.

"I do not think we even took testimony.

"I think we just kind of took statements of the parties at the time.

"Mr. Price was not given notice of that.

"That is why he has been allowed to participate now.

. . . .

"The legal issue, as the Court understands the *Ross* case, is whether it is in the best interest of the child—and that is the underlying aspect here, is what is in the best interest of the child—whether it is the best interest of the child to overcome a legal presumption as to parentage.

"Keep in mind, the legal presumption here is with [P.R.] because his name is on the birth certificate.

"But I have to say that the evidence would show that is somewhat dubious.

"I mean, yes, technically, he is the presumed father, but I think from the evidence and from what we understand of the situation, that it was known from the very outset that [P.R.] was not the biological father, but that [J.P.] was.

"It is apparent to the Court that the child, I think, probably recognizes both as the father figure.

"It is apparent that the child has a bond with each family, with [P.R.'s and J.P.'s respective] families.

"Maybe more primarily with his grandmother on [J.P's] side.

"But from the evidence, from the pictures of this, it looks like [J.P.] has been somewhat involved.

"I will say [J.P.] did not help himself with his testimony today and the attitude that he has shown.

12

"But be that as it may, you know, looking at it from [C.R.]'s standpoint as to what is in his best interest, I think it is in his best interest that he essentially have connection with both families.

"Which what the Court can see, what that means is that the Court will allow [J.P.] in because, if I do not, then I think there is no legal way for that side of the family to have any standing at all.

"I think this child will always have some contact and connection to the [P.R.] family simply because he has two halfsiblings and will have two halfsiblings.

"You know, that is not going to change.

"So he is always going to be able to maintain some contact there.

"So the Court will grant the petition for the reasons just stated and allow [J.P.] to assume roles as the father.

"So that completes that part of the case."

*The district court was faced with competing presumptions.*

On review of the record, the first question we must analyze is whether P.R. and J.P. present competing statutory presumptions of legal paternity. Both the KPA and caselaw acknowledge that presumptions of paternity may arise in favor of different men. *Greer*, 50 Kan. App. 2d at 186. The KPA includes six possible bases for the presumption of paternity and recognizes situations where "two or more presumptions . . . arise which conflict with each other." K.S.A. 2021 Supp. 23-2208(c). Two such presumptions arose in this case.

Despite our determination that the initial paternity order was void, under K.S.A. 2021 Supp. 23-2208(a)(4), P.R. is still statutorily presumed the father, even without the benefit of the district court's first paternity order. This statute presumes paternity if the "man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made in accordance with" other portions of the KPA inapplicable here. K.S.A. 2021 Supp. 23-2208(a)(4). P.R. does not allege he signed a statutory voluntary acknowledgment form, but he did notoriously and in writing

13

recognize his paternity of C.R. He is listed on C.R.'s birth certificate, he has acknowledged numerous times in the district court record he is C.R.'s father, and C.R. shared his last name. However, P.R.'s consistent admission that he is not C.R.'s biological parent allowed for the possibility of a conflicting presumption. See *Smith*, 306 Kan. at 56-57.

Under K.S.A. 2021 Supp. 23-2208(a)(5), a man is presumed to be the father of a child if genetic testing indicates a probability of 97% or greater that the man is the father of the child. Although the record before us is devoid of any formal test results, multiple witnesses testified, and have repeatedly accepted, that genetic tests voluntarily procured by O.B. in 2018, without court involvement, showed J.P. is a biological parent of C.R. While the KPA requires a verified written report of expert genetic examiners to be admitted into evidence under K.S.A. 2021 Supp. 23-2212(b) if the parties agree to conduct genetic testing, the law provides an exception if "the court finds that paternity of the child is not in issue." Here, the genetic test was performed prior to J.P.'s motion to determine paternity, and all parties openly acknowledged and accepted the test results during court testimony, with no party lodging a formal objection to the same or even stating any objection in any form. The district court then did not err by considering the genetic test results, as there was no dispute regarding biological paternity. See *Greer,* 50 Kan. App. 2d at 191 (citing K.S.A. 2013 Sup. 23-2212[c]).

Because both legal presumptions existed prior to J.P.'s 2020 motion to determine a father/child relationship, the district court was then faced with competing presumptions of paternity as contemplated by K.S.A. 2020 Supp. 23-2208(c):  (1) the presumption of P.R.'s paternity under K.S.A. 2020 Supp. 23-2208(a)(4), and (2) the presumption of J.P.'s paternity under K.S.A. 2020 Supp. 23-2208(a)(5).

*Weighing the competing presumptions by applying the law to the facts.*

A district court weighs conflicting presumptions of paternity by hearing the evidence directly and making a judgment call. Therefore, we review the district court's decision for an abuse of discretion. See *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011). Pursuant to this standard, the appellate court must uphold the district court's conclusion unless it was based on a mistaken view of the facts or the law or no reasonable person would agree with the decision. That is, we affirm the trial court so long as its decision is "made within and takes into account the applicable legal standards. . . . [But] an abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider statutory limitations." *Harrison*, 292 Kan. at 672 (quoting *State v. Shopteese*, 283 Kan. 331, 340, 153 P.3d 1208 [2007]).

When a district court is faced with competing presumptions, K.S.A. 2021 Supp. 23-2208(c) requires the court "to weigh the competing presumptions and find in favor of the presumption 'founded on the weightier considerations of policy and logic, including the best interests of the child.'" *Greer*, 50 Kan. App. 2d at 191. As a matter of first impression in Kansas, a panel of this court examined this standard in *Greer*. The panel first addressed the lack of existing caselaw to guide courts when weighing competing presumptions under this "policy and logic" standard, and second, noted multiple factors articulated over the years to examine the "best interests of the child." *Greer,* 50 Kan. App. 2d at 193-96. The panel's opinion reviewed the standards under K.S.A. 2013 Supp. 23-2208(c) as guidance to future courts, given the matter's first impression in the Kansas appellate court system.

Comparing this standard to the one utilized by the district court in this matter, we find the district court failed to properly consider the standard set forth in K.S.A. 2020 Supp. 23-2208(c) and did not fully apply the appropriate legal standard to the facts presented. The district court found the "legal presumption here [was] with [P.R.] because

15

his name [was] on the birth certificate" and endeavored to determine whether it was in the child's best interest to overcome this legal presumption. The district court operated from the premise that the earlier paternity order was valid, and it was J.P.'s burden to come forward with clear and convincing evidence to rebut the standing presumption of P.R.'s paternity. See K.S.A. 2020 Supp. 23-2208(b); see *Smith*, 306 Kan. at 47-48.

But this premise was a mistake of law. The appropriate posture of this dispute was that the district court was faced with competing legal presumptions which required application of the standard set forth under K.S.A. 2020 Supp. 23-2208(c):  to make findings, based on the facts presented, and decide which presumption was founded on the weightier considerations of policy and logic, including the best interests of the child. Although the district court repeatedly mentions the best interest of the child, and the *Ross* case, the district court did not articulate the considerations of policy and logic, and improperly cited the *Ross* case as an appropriate standard without explanation.

In fact, the *Ross* case is inapplicable to this matter given its procedural posture at the time of the 2020 hearing. The *Greer* panel examined *Ross* and the evolution of both the KPA and caselaw to conclude that, while *Ross* remains good law, a *Ross* hearing is "only required in two very specific situations." *Greer*, 50 Kan. App. 2d at 190-91. These two circumstances include 1) when the genetic test is not performed prior to the filing of the paternity action, or 2) the genetic test was accomplished prior to the filing of the paternity action, but a proper statutory objection is lodged, making the result of the test inadmissible. *Greer*, 50 Kan. App. 2d at 190-91. A *Ross* hearing may have been appropriate, had circumstances been different and J.P. initially added to the paternity action prior to the conduction of genetic testing. But that is not what happened here.

Finding the district court misapplied the legal standard, we reverse the decision of the district court to designate J.P. the legal father of C.R. and remand the case for a

16

hearing wherein it must weigh the competing presumptions as required by K.S.A. 2021 Supp. 23-2208(c). *Greer*, 50 Kan. App. 2d at 192-93.

This panel is also concerned regarding the district court's mistaken view of the facts of this case as they relate to the required statutory standards. In that vein, we find it prudent to reiterate the analysis suggested by the court in *Greer* when weighing the conflicting presumptions under K.S.A. 2021 Supp. 23-2208(c). *Greer*, 50 Kan. App. 2d at 193.

### *Weightier considerations of policy and logic*

The *Greer* court found "the *policy and logic* portion of the [K.S.A. 2021 Supp. 23-2208(c)] inquiry appears in part to be heavily based on a state's individual caselaw and policy." 50 Kan. App. 2d at 193 (collecting cases). For example, one such policy found in several states, including Kansas, is the presumption of legitimacy, where a child is born to married parents. 50 Kan. App. 2d at 193-94 (citing *Ross*, 245 Kan. at 596). This presumption may be considered weightier than other statutory presumptions pursuant to public policy, but the legitimacy presumption is not present here. See *Greer*, 50 Kan. App. 2d at 193-94.

As a matter of policy, though, our Kansas Supreme Court has recognized the significant "rights of biological fathers who promptly assert their rights by taking affirmative steps to show they are fully committed to accepting parenting responsibilities." *Greer*, 50 Kan. App. 2d at 194 (citing *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 3). Our high court found:

> "'A natural parent's right to the companionship, care, custody, and management of his or her child is a liberty interest. The liberty interest of a natural parent has its origin in the biological connection between the parent and child, but a biological relationship does not guarantee the permanency of the parental rights of an unwed natural father. Rather, the

significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. *The opportunity is lost, however, if the natural father does not come forward to demonstrate a full commitment to the responsibilities of parenthood.*'" (Emphasis added.) *Greer*, 50 Kan. App. 2d at 194 (quoting *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 30).

On remand, the district court must apply these weightier considerations of policy and logic to the facts to determine, for example, whether J.P. promptly asserted his rights and took affirmative steps to demonstrate his full commitment to accepting parental responsibilities. And, although the district court articulated why, in its view, J.P.'s legal paternity may have been the better choice, the district court made no findings at all regarding the ongoing relationship between P.R. and the child. Although these analyses are not exclusive of other considerations of policy and logic necessary for the district court to consider, such examinations were missing from the district court's discussion.

### Best interests of the child standard

In addition to the weightier considerations of policy and logic, the district court was required to address the best interests of the child. Through the evolution of caselaw, courts have refined the "best interests" standard to encompass approximately 10 factors.

"These factors have been summarized as including: (1) whether the child thinks the presumed father is his or her father and has a relationship with him; (2) the nature of the relationship between the presumed father and child and whether the presumed father wants to continue to provide a father-child relationship; (3) the nature of the relationship between the alleged father and the child and whether the alleged father wants to establish a relationship and provide for the child's needs; (4) the possible emotional impact of establishing biological paternity; (5) whether a negative result regarding paternity in the presumed father would leave the child without a legal father; (6) the nature of the mother's relationships with the presumed and alleged fathers; (7) the motives of the party raising the paternity action; (8) the harm to the child, or medical need in identifying the

biological father; (9) the relationship between the child and any siblings from either the presumed or alleged father; and (10) whether there have been previous opportunities to raise the issue of paternity." *Greer*, 50 Kan. App.2d at 195 (citing 1 Elrod and Buchele, Kansas Family Law § 7.15 [1999]).

Although the district court articulated the best interests of the child standard generally, it did not note any of these specific factors and based its order primarily on the child's connections to both men's families. Standing alone, this may not amount to error significant enough to reverse the district court's decision as this list of factors is nonexclusive; however, it should be noted. See *Greer*, 50 Kan. App 2d at 196 (Although the court examined a number of factors, it also concluded that "courts weighing two or more conflicting presumptions may consider a wide array of nonexclusive factors when deciding which presumption serves the child's best interests.").

On remand, the district court must determine how, on balance, the suggested factors weigh to determine how C.R.'s best interests would be served.

CONCLUSION

For the reasons described, although we affirm the district court's setting aside of the initial paternity order to the extent the void order has no force and effect, we reverse the district court's decision to designate J.P. the legal father of C.R. and remand this matter for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded with directions.

19