IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,833

In the Matter of the PARENTAGE OF R.R.

SYLLABUS BY THE COURT

1.

The Kansas Parentage Act, K.S.A. 2022 Supp. 23-2201 et seq., recognizes claims of parentage based on genetics, adoption, and other circumstances giving rise to statutory presumptions of parentage.

2.

The Kansas Parentage Act imposes shifting burdens of proof on parties seeking to establish paternity through a statutory presumption. If the party alleging paternity establishes an initial presumption of paternity, the burden shifts to the other party to rebut that presumption. If the presumption is rebutted, the party alleging paternity bears the burden of going forward with the evidence by a preponderance of the evidence. When competing presumptions exist, the court must decide parentage based on the presumption yielding the weightier considerations of policy and logic, including the best interests of the child.

3.

Weighing conflicting presumptions and determining the best interests of a child involve judgment calls for the district court; thus, an appellate court reviews the district court's decisions for an abuse of discretion. A judicial action constitutes an abuse of discretion if it is arbitrary, fanciful, or unreasonable, if it is based on an error of law, or if substantial competent evidence does not support a finding of fact on which the exercise

1

of discretion is based. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion.

Review of the judgment of the Court of Appeals in an unpublished opinion filed October 14, 2022. Appeal from Barton District Court; STEVEN E. JOHNSON, judge. Oral argument held May 16, 2023. Opinion filed November 22, 2023. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Jeffrey N. Lowe*, of Penner Lowe Law Group, LLC, of Wichita, argued the cause, and *Candice Y. Farha*, of the same firm, was with him on the briefs for appellant T.T.

*Tish Morrical*, of Hampton & Royce, L.C., of Salina, argued the cause, and was on the brief for appellee T.R.

The opinion of the court was delivered by

STANDRIDGE, J.: The Kansas Parentage Act (KPA), K.S.A. 2022 Supp. 23-2201 et seq., recognizes claims of parentage based on genetics, adoption, and other circumstances giving rise to statutory presumptions of parentage. When competing presumptions exist, the KPA directs the court to decide parentage based on the presumption yielding "the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2022 Supp. 23-2208(c).

This case involves such competing presumptions of paternity. T.T. filed an action seeking paternity rights to his biological son, R.R., who was conceived and born to Mother during her marriage to T.R. In reaching its decision, the district court weighed the competing presumptions of paternity, considered the totality of the circumstances, and held T.R. had the weightier presumption and R.R.'s best interests would be served by naming T.R. the legal father. A Court of Appeals panel affirmed the district court's

2

decision. *In re Parentage of R.R.*, No. 123,833, 2022 WL 7813894 (Kan. App. 2022) (unpublished opinion).

On review, T.T. argues the district court misapplied the KPA by giving too much weight to the marital presumption without giving equal weight to the biological presumption, thus holding him to a higher burden of proof than statutorily required. He also argues the district court had an unconscious bias against him that led it to improperly weigh the best interests of the child factors set forth in *Greer v. Greer*, 50 Kan. App. 2d 180, 195-96, 324 P.3d 310 (2014).

After careful review of the entire record, we conclude the district court did not assign greater weight to the marital presumption and made its decision based on the appropriate consideration of applicable policy and logic, including the best interests of the child, as required by the KPA. We further conclude that the district court's best interest findings are supported by substantial competent evidence. As a result, we affirm the panel's decision upholding the district court's ruling in favor of T.R.

FACTS

Mother and T.R. had a son in October 2015. They married in May 2017. In March 2019, while still married to T.R., Mother gave birth to R.R. T.R. was present for R.R.'s birth and signed the birth certificate.

But Mother was romantically involved with T.T. when R.R. was conceived. T.T. took a paternity test when R.R. was around three months old. The test results established a 99.9% probability that T.T. was R.R.'s biological father.

In November 2019, T.T. filed a paternity action in the district court, requesting a declaration of paternity and shared legal custody of R.R. The district court later granted

3

T.R.'s motion to intervene in the paternity action. While the case was pending, T.R. filed for divorce and Mother moved in with T.T.

In September 2020, when R.R. was 18 months old, the parties appeared before the district court for a hearing on the paternity case. At that time, T.R. and Mother were still separated but their divorce was not finalized. They shared residential custody of R.R. and his older brother (Brother). Mother lived with T.T., but they had no current plans to marry.

Highly summarized, the evidence presented at the hearing established that R.R. referred to both T.T. and T.R. as "'Dada.'" They each had a positive, father-son relationship with R.R., loved R.R. deeply, and would do anything for him. T.T. and T.R. each had stable housing and employment. Both men had supportive family members who lived nearby, saw R.R. regularly, and viewed R.R. as an integral part of their families. The evidence showed that T.T., T.R., and their families would continue to love R.R. and wanted to be part of his life regardless of the district court's decision. Neither T.T. nor T.R. would object to R.R. continuing a relationship with whomever was not named the legal father.

At the hearing, T.T.'s arguments focused on his relationship with R.R. since learning he was R.R.'s biological father, his current relationship with Mother, and his claims that he would have been more involved in R.R.'s life earlier had he been given the opportunity. T.T. pushed for the paternity test as soon as Mother acknowledged he might be R.R.'s father. After the test results confirmed he was R.R.'s father, T.T. gave Mother money to help support R.R. and expressed a desire to be in his life. When R.R. was around three months old, T.T. began semi-regular visits with him, which later included overnight, weekend, and week-long visits. T.T. was persistent about seeing R.R. at every opportunity and took care of him whenever Mother would allow it. After Mother moved

in with him, T.T. began spending more time with R.R. At the time of the hearing, T.T. and Mother had custody of R.R. and Brother every other week.

Mother testified in support of T.T.'s petition. Mother agreed T.T. had always wanted to be involved in R.R.'s life, noting he had provided financial and other support since learning he was R.R.'s biological father. Mother said T.T. had a good relationship with Brother and treated him like a son. If T.T. were named the legal father, Mother did not believe it would affect R.R.'s bond with Brother. Mother admitted she had earlier wanted T.R. to be R.R.'s legal father and had opposed T.T.'s desire to change R.R.'s last name. Mother said she had done so because she was trying to salvage her marriage, but she now supported T.T. being named the legal father and changing R.R.'s last name.

In response to T.T.'s petition, T.R. provided evidence that he had acted as R.R.'s primary father for the first several months of his life and had supported R.R. since even before his birth. T.R.'s feelings for R.R. did not change after learning he was not R.R.'s biological father. T.R.'s family also did not feel any differently about R.R., and they still considered R.R. to be T.R.'s son. At the hearing, T.R. highlighted R.R.'s close relationship with Brother. Several witnesses testified R.R. and Brother had a strong bond and a special relationship; the witnesses described the relationship as best friends who did everything together. T.R. believed the boys' relationship would suffer if T.T. were named the legal father because they would have different custody arrangements and different last names.

After hearing this testimony and considering photos, text messages, receipts, and other exhibits in support of the parties' respective positions, the district court denied T.T.'s paternity petition and declared T.R. the legal father of R.R. Recognizing the competing presumptions of paternity under K.S.A. 2022 Supp. 23-2208(a), the district court applied the factors used to consider the best interests of the child in paternity cases set forth in *Greer*. The court made detailed findings on the relevant *Greer* factors and

5

determined they weighed in favor of T.R. In reaching its decision, the court relied primarily on T.R.'s longer and more consistent relationship with R.R. and R.R.'s close relationship with Brother. The court concluded it would be in R.R.'s best interest to have the same legal parents as Brother.

T.T. moved to alter or amend the district court's decision. He claimed the court had given too much deference and weight to T.R.'s presumptions of paternity and did not meaningfully consider his biological connection to R.R. and the stable family environment he and Mother provided. T.T. also argued the court improperly weighed the *Greer* factors, alleging the court's factual findings defied logic and lacked support. After considering the parties' written and oral arguments, the district court denied T.T.'s motion.

The Court of Appeals affirmed the district court's decision. The panel held, in relevant part, that the district court made no legal or factual errors in weighing the parties' competing presumptions of paternity under the KPA and in applying the *Greer* best interest factors. See *In re Parentage of R.R.*, 2022 WL 7813894, at *3-11.

We granted T.T.'s petition for review on these issues. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

T.T. claims two errors:  (1) The district court erroneously applied the KPA burden- shifting provisions governing parental presumptions and (2) the district court abused its discretion in balancing the *Greer* factors to determine parentage. We address each claim in turn.

6

1.      *The KPA provisions governing parental presumptions*

Whether the district court applied the correct legal standard raises a question of law over which appellate courts exercise unlimited review. *Harrison v. Tauheed*, 292 Kan. 663, 672, 256 P.3d 851 (2011). Resolution of this issue involves interpretation of the KPA, which also presents a question of law subject to unlimited appellate review. See *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

Other than proceedings under the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., the KPA governs all proceedings relating to the parentage of a child. K.S.A. 2022 Supp. 23-2201(b). The purpose of the KPA is to provide for the "equal, beneficial treatment of children." *In re Marriage of Ross*, 245 Kan. 591, 597, 783 P.2d 331 (1989). The KPA defines a "parent and child relationship" as "the legal relationship existing between a child and the child's biological or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." K.S.A. 2022 Supp. 23-2205. The parent and child relationship includes the father and child relationship and "extends equally to every child and to every parent, regardless of the marital status of the parents." K.S.A. 2022 Supp. 23-2205; K.S.A. 2022 Supp. 23-2206.

In addition to the biological and adoptive relationships explicitly recognized under K.S.A. 2022 Supp. 23-2205, a father and child relationship may be established by other circumstances set forth in the KPA. See K.S.A. 2022 Supp. 23-2207(b) (A father and child relationship "may be established under this act or, in the absence of a final judgment establishing paternity, by a voluntary acknowledgment of paternity meeting the requirements of K.S.A. 2022 Supp. 23-2204."); *Frazier v. Goudschaal*, 296 Kan. 730, 746, 295 P.3d 542 (2013) ("[T]he parental relationship for a father can be legally established under the KPA without the father actually being a biological or adoptive parent."). The KPA lists six possible bases for the presumption of paternity that can apply

7

to establish a father and child relationship. K.S.A. 2022 Supp. 23-2208(a). Summarized, these presumptions are:

(1) The man and the child's mother were married when the child was conceived or born.

(2) Before the child's birth, the man and the child's mother attempted to marry but the marriage was void or voidable.

(3) After the child's birth, the man and the child's mother attempted to marry but the marriage was void or voidable and (a) the man acknowledged paternity in writing, (b) the man consented to his name on the birth certificate, or (c) the man is obligated to support the child under written voluntary promise or by court order.

(4) The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment of paternity.

(5) Genetic test results indicate a probability of 97% or greater that the man is the father of the child.

(6) The man has a duty to support the child under an order of support regardless of whether the man has ever been married to the child's mother.

The KPA imposes shifting burdens of proof on parties seeking to establish the existence of a father and child relationship through one of these presumptions.

8

*First*, the party alleging the existence of a father and child relationship bears the burden to prove an initial presumption of paternity. *In re M.F.*, 312 Kan. 322, 341-42, 475 P.3d 642 (2020).

*Second*, if the party alleging the existence of a father and child relationship succeeds in establishing a presumption, then the burden shifts to the other party to rebut that presumption. The other party may rebut the presumption of a legal father and child relationship by presenting

- clear and convincing evidence disproving the basis for the presumption,

- a court decree establishing paternity of the child by another man, or

- a conflicting presumption. K.S.A. 2022 Supp. 23-2208(b).

*Third*, "[i]f a presumption is rebutted, the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence" by a preponderance of the evidence. K.S.A. 2022 Supp. 23-2208(b); see *In re M.F.*, 312 Kan. at 341-42 (noting the burden at this step is preponderance of the evidence).

*Fourth*, if two or more conflicting presumptions arise, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control." K.S.A. 2022 Supp. 23-2208(c).

T.T. argues the district court misapplied this KPA burden-shifting framework. Specifically, he asserts the court erred by beginning its K.S.A. 2022 Supp. 23-2208(c) conflicting presumptions analysis with T.R.'s marital presumption and then imposing on T.T. the burden to present compelling evidence to overcome that presumption. We are not persuaded by T.T.'s argument.

9

At the beginning of its Memorandum Decision, the district court made paternity presumption findings based on the facts and the agreement of the parties:

"All the parties recognize that the Petitioner, [T.T.], has a presumption pursuant to a DNA test obtained from a private source with the consent of the Mother prior to the filing of this action. The parties also agree that the presumptive father, [T.R.], has a valid presumption of paternity pursuant to his marriage to the Mother at the time of conception and birth, but currently has a divorce proceeding pending. Further, [T.R.] is the named father on the child's birth certificate.

"Neither the Mother or the presumptive father, [T.R.], have challenged the validity of the DNA test. The Court at pretrial, and prior to the commencement of this hearing indicated to the parties that it believed that it was the Court's obligation to proceed as outlined in the case of [*Greer v. Greer*], 50 Kan. App. 2d 180, 324 P.3d 310 (2014)."

The court's findings, to which the parties agreed, resolved the first two steps of the KPA's burden-shifting framework. *First*, T.T., as the party seeking to prove the existence of a parent-child relationship, successfully proved an initial presumption of paternity under K.S.A. 2022 Supp. 23-2208(a)(5) by providing genetic test results showing a 99.99% probability that R.R. is his biological child. *Second*, T.R. rebutted T.T.'s biological presumption of paternity by presenting evidence of two competing presumptions: (1) he was married to the child's mother when the child was conceived and born, K.S.A. 2022 Supp. 23-2208(a)(1); and (2) he notoriously recognized his paternity of the child by consenting to his name as father on the child's birth certificate, K.S.A. 2022 Supp. 23-2208(a)(4).

Having determined the parties successfully carried their respective burdens at the first and second steps, the court began its legal analysis at the third and fourth steps of the

framework, which shifted the burden back to T.T. These steps imposed on T.T. "the burden of going forward with the evidence" to prove by a preponderance of the evidence that the biological presumption is "founded on the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2022 Supp. 23-2208(b) and (c); *In re M.F.*, 312 Kan. at 341-42. The district court used the factors set forth in *Greer*, 50 Kan. App. 2d at 195-96, to balance the competing considerations.

T.T. argues the district court misapplied the KPA by starting its *Greer* competing-presumptions analysis with the marital presumption instead of the biological presumption. T.T. points to several statements in the district court's opinion to support his argument:

- "[I]t is the Court's belief that [T.R.] is currently the legal father of the child."

- "[T]he Court is of the opinion that no evidence presented at the hearing would compel the Court to believe that it is in the best interest of the child to undo the current legal status of [T.R.] as the child's father despite the biology of the child."

- "[T]he Court adopts [the marital] presumption as not being overcome by any of the evidence presented by [T.T.] in regards to the best interest of the child."

T.T. claims these statements demonstrate the district court started its *Greer* competing-presumptions analysis with the marital presumption, which he argues improperly imposed on him the burden to overcome T.R.'s marital presumption. To the extent these and other statements support a finding that the district court started its *Greer* competing-presumptions analysis with the marital presumption, we find the court's analysis consistent with the KPA burden-shifting framework. As discussed above, the third and fourth steps of the framework—the point at which the court is required to weigh competing presumptions—imposed on T.T. (as the party alleging the existence of a father

11

and child relationship) "the burden of going forward with the evidence" to prove the biological presumption is "founded on the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2022 Supp. 23-2208(b) and (c); *In re M.F.*, 312 Kan. at 341-42. Thus, to the extent that it did so, the district court properly imposed on T.T. the burden to overcome T.R.'s marital presumption when it weighed competing interests under K.S.A. 2022 Supp. 23-2208(c). T.T.'s argument claiming otherwise has no merit.

2.       *Weighing competing presumptions under* Greer

T.T. argues the district court erred in weighing the *Greer* factors to resolve the competing paternity presumptions. In *Greer*, a Court of Appeals panel set forth a non-exclusive list of factors to consider in resolving competing parental presumptions under K.S.A. 2013 Supp. 23-2208(c). The factors basically are a compilation of considerations taken into account by courts across the country making decisions about the best interests of the child in paternity cases. *Greer*, 50 Kan. App. 2d at 195-96. The panel acknowledged its analysis was one of first impression in Kansas and compiled the factors "to provide future guidance when courts are faced with competing presumptions." 50 Kan. App. 2d at 193.

The *Greer* panel noted that a best-interests analysis is "incredibly fact-specific and rarely limited to a narrow number of factors," and recognized that "courts weighing two or more conflicting presumptions may consider a wide array of nonexclusive factors when deciding which presumption serves the child's best interests." 50 Kan. App. 2d at 196. The panel cited 10 factors that courts traditionally have used to consider the best interests of the child in paternity cases:

> "(1) whether the child thinks the presumed father is his or her father and has a
> relationship with him; (2) the nature of the relationship between the presumed father and

12

child and whether the presumed father wants to continue to provide a father-child relationship; (3) the nature of the relationship between the alleged father and the child and whether the alleged father wants to establish a relationship and provide for the child's needs; (4) the possible emotional impact of establishing biological paternity; (5) whether a negative result regarding paternity in the presumed father would leave the child without a legal father; (6) the nature of the mother's relationships with the presumed and alleged fathers; (7) the motives of the party raising the paternity action; (8) the harm to the child, or medical need in identifying the biological father; (9) the relationship between the child and any siblings from either the presumed or alleged father; and (10) whether there have been previous opportunities to raise the issue of paternity." *Greer*, 50 Kan. App. 2d at 195 (citing 1 Elrod and Buchele, Kansas Family Law § 7.15 [1999]).

The panel also referenced several additional factors that may be considered:

> "'Time may be a major factor' in determining best interests, as well as 'the notoriety of the child's situation in the community,' the stability of the home in which the child will reside, the child's uncertainty regarding the paternity issue, 'and any other factors that will maximize the child's opportunities for a successful life.'" *Greer*, 50 Kan. App. 2d at 195 (quoting 1 Elrod and Buchele, Kansas Family Law § 7.15 [1999 & Supp. 2013]).

Although it has been almost a decade since the Court of Appeals issued its *Greer* opinion adopting the best interests of the child factors as the primary legal analysis used to weigh competing paternity presumptions under K.S.A. 2013 Supp. 23-2208(c), no party has ever asked this court to adopt it. In fact, the parties here do not ask us to adopt the *Greer* factors. Nor do they challenge the district court's decision to apply the *Greer* factors to weigh competing paternity presumptions. Instead, T.T. argues the district court erred in *weighing* the *Greer* factors to resolve the competing paternity presumptions.

Because the parties argued the *Greer* factors to the district court, the district court used the *Greer* factors to weigh and resolve competing paternity presumptions, and T.T.

frames his issue on review as one of error by the district court in weighing the *Greer* factors, we will use the *Greer* factors to decide whether the district court abused its discretion in weighing them. But we do so without adopting them or assessing whether they should be considered the proper legal standard for the court to determine "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child." K.S.A. 2022 Supp. 23-2208(c).

Weighing conflicting presumptions and determining the best interests of a child involve judgment calls for the district court, which hears the evidence directly. We review these decisions only for an abuse of discretion. See *State, ex rel. Secretary, DCF v. M.R.B.*, 313 Kan. 855, 861-62, 491 P.3d 652 (2021). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would agree with the district court's judgment; (2) it is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. 313 Kan. at 861-62; *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

T.T. argues the district court abused its discretion by arbitrarily and unreasonably weighing the competing presumptions based on unconscious bias, prejudice, and personal preference rather than substantial competent evidence. We construe T.T.'s argument to allege an abuse of discretion under both the first and third options. Under the first option, he alleges the district court's decision finding T.R.'s presumptions weightier than T.T.'s presumption is arbitrary, fanciful, and unreasonable. Under the third option, he alleges substantial competent evidence does not support the factual findings relied on by the district court in assessing the *Greer* factors. We address T.T.'s allegations in reverse order.

a. *Substantial competent evidence*

Substantial competent evidence refers to legal and relevant evidence a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). T.T. suggests that—in the context of weighing and deciding competing parental presumptions—clear and convincing evidence is required to satisfy the substantial competent evidence standard.

T.T.'s suggestion conflates the language in the statutes. See K.S.A. 2022 Supp. 23-2208(b) ("A presumption under this section may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man or as provided in subsection [c]."); K.S.A. 2022 Supp. 23-2208(c) ("If two or more presumptions under this section arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control."). Subsection (b) provides that one way to rebut the initial presumption of paternity is by clear and convincing evidence. But subsection (c)—the provision addressing conflicting presumptions—does not mention clear and convincing evidence. By including the clear and convincing language in subsection (b) and not in subsection (c), the Legislature implicitly declared that clear and convincing evidence is not required to resolve competing statutory presumptions. See *In re M.F.*, 312 Kan. at 341-42 ("The ultimate burden placed on the party seeking recognition of the relationship can be discharged by a preponderance of the evidence, as a 'clear and convincing evidence' standard is not specified in the way it is on rebuttal of the initial presumption."). Thus, T.T. had the ultimate burden to establish, by a preponderance of the evidence, that his biological presumption was founded on the weightier considerations of policy and logic, including the best interests of the child. The district court made findings on the *Greer* factors to determine whether T.T. met his burden.

As discussed, we review the district court's *Greer* factor findings for substantial competent evidence. See *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). The court's findings on each factor are summarized below. Although the factors refer to both a "presumed" father and an "alleged" father, the district court appeared to consider both T.R. and T.T. presumed fathers.

1. *Whether the child thinks the presumed father is his or her father and has a relationship with him*: The district court found R.R.'s concept of "father" was limited due to his young age, but he called both T.R. and T.T. "'Dada'" and had a relationship with both men. The court found this factor weighed in favor of T.R. because he had been "far more the committed father to this point" but agreed T.T. would have been just as committed if given the opportunity.

2. *The nature of the relationship between the presumed father and child and whether the presumed father wants to continue to provide a father-child relationship*: The court found this factor favored T.R. because he had "far more of a father/son relationship than [T.T.]," noting that T.T.'s relationship with R.R. was based on Mother's decisions. The court concluded that "the natural relationship, at this time, of father/child lies with [T.R.]."

3. *The nature of the relationship between the alleged father and the child and whether the alleged father wants to establish a relationship and provide for the child's needs*: The court found both T.R. and T.T. wanted to continue their relationships with R.R. and provide for his needs. The court appeared to weigh this factor in T.R.'s favor, finding that he had been providing for R.R. his entire life. The court did note that T.T. also would have done so had he been given the opportunity.

4. *The possible emotional impact of establishing biological paternity*:  The court expressed a belief this factor would have "very little impact" due to R.R.'s age but found taking away T.R.'s father relationship and giving it to T.T. would not improve R.R.'s situation or be in his best interests.

5. *Whether a negative result regarding paternity in the presumed father would leave the child without a legal father*:  This factor did not apply here.

6. *The nature of the mother's relationships with the presumed and alleged fathers*:  The district court found this factor favored T.R. due to the certainty of Mother's relationship with him. Although Mother and T.R. were in the process of divorcing, they would continue to co-parent Brother. The court noted Mother had initially supported T.R. being named R.R.'s father, but later supported T.T.'s desire to seek legal paternity after her relationship with T.T. became more serious. The court found the possibility of Mother and T.T. having additional children together in the future did not outweigh the certainty of Mother's relationship with T.R.

7. *The motives of the party raising the paternity action*:  The court found T.T. had "no sinister motives" and assigned no weight to this factor.

8. *The harm to the child, or medical need in identifying the biological father*:  The court noted T.T. already had been identified as the biological father and found this factor had no bearing on R.R.'s best interests.

9. *The relationship between the child and any siblings from either the presumed or alleged father*:  The court found maintaining full brotherhood between R.R. and Brother weighed in T.R.'s favor.

17

10. *Whether there have been previous opportunities to raise the issue of paternity*:
The court found T.T. timely filed his petition and assigned no weight to this factor.

The district court also referenced the additional factors in *Greer* that may be considered in determining the best interests of a child, including "the notoriety of the child's situation in the community, the stability of the home in which the child will reside, the child's uncertainty regarding the paternity issue and any other factors that will maximize the child's opportunity for success in life." The court found that while both T.R. and T.T. had "the ability to provide opportunities for a successful life," the totality of the circumstances weighed in T.R.'s favor.

T.T. agrees that the district court properly weighed factor 9—R.R.'s relationship with Brother—in T.R.'s favor. But he claims substantial competent evidence does not support the district court's findings in favor of T.R. with respect to the other factors. Specifically, he argues the evidence supports a finding of neutrality with respect to factors 1, 2, 3, and 6 and a finding in favor of him with respect to factors 4, 8, and the additional factors.

To the extent T.T.'s arguments ask this court to reweigh the evidence, we must decline this invitation. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). And contrary to T.T.'s remaining arguments, we find substantial competent evidence supports the district court's findings that factors 1, 2, 3, and 6 weigh in T.R.'s favor, given the nature and length of T.R.'s relationship with R.R. and the certainty of T.R.'s relationship with Mother. Even if we were to find that T.T. had introduced equally compelling evidence relating to each of these factors, we may not disturb district court findings supported by substantial competent evidence. See *Peterson*, 302 Kan. at 106.

T.T.'s arguments alleging a lack of substantial competent evidence to support factor 4 (the possible emotional impact of establishing biological paternity) and factor 8

18

(the harm or medical need in identifying the biological father) fare no better. As discussed, the district court found that establishing biological paternity would have little emotional effect on R.R. given his age and that it would not be in R.R.'s best interests to remove T.R.'s status as father in favor of T.T. The court also noted T.T. already had been identified as the biological father, so the "harm or medical need" factor carried little weight in its decision.

T.T. contends the district court erred in assigning minimal weight to these factors and in limiting its analysis to R.R.'s age at the time of the hearing. T.T. claims the court should have relied on these factors to give more weight to his biological connection with R.R. and focused on how biological paternity can impact a child throughout his or her life. For support, T.T. cites research on the emotional impact of establishing biological paternity and the harm that may result when a child is cut off from a biological parent.

But as noted by the panel, T.T. did not present this research to the district court, so the court made no factual findings related to this evidence. As a result, T.T.'s arguments lack support in the record. See *State v. Hutto*, 313 Kan. 741, 746, 490 P.3d 43 (2021) (Appellate courts are courts of review and are unable to make fact findings.); *Smith v. Printup*, 254 Kan. 315, 353, 866 P.2d 985 (1993) (assertions in appellate brief are not sufficient to satisfy inadequacies in record on appeal).

T.T.'s arguments regarding factors 4 and 8 are further undermined by the reality that these factors assume the biological father has not yet been identified. Factor 4 relates to the "possible emotional impact of *establishing* biological paternity," while factor 8 addresses the "harm to the child, or medical need in *identifying* the biological father." (Emphasis added.) *Greer*, 50 Kan. App. 2d at 195. The district court appeared to place little weight on these factors because genetic testing already had identified and established T.T. as the biological father. And T.T.'s suggestion that R.R. would suffer harm if he were cut off from a biological parent lacks support in the record. T.T. and his

19

family testified they intend to remain in R.R.'s life regardless of the district court's paternity decision. In addition, T.R. testified that if named the legal father, he would not object to R.R. continuing a relationship with T.T.

Under these circumstances—where the biological father was known and present in the child's life—there is substantial competent evidence supporting the district court's findings that factors 4 and 8 carried little, if any, weight.

Finally, T.T. alleges a lack of substantial competent evidence to support the district court's finding that the additional *Greer* factors weighed in T.R.'s favor. T.T. claims the community knows he is R.R.'s biological father, his home is as stable as T.R.'s home, and he and his extended family have an equally strong bond with R.R. as T.R. and his family do. T.T. contends the district court failed to explain how finding in T.R.'s favor would affect R.R.'s uncertainty over the paternity issue or maximize R.R.'s opportunity for success in life. It is worth noting the district court made no specific findings on each of these factors and did not rely on them significantly in making its decision. Instead, the court generally mentioned the factors and concluded that the totality of the circumstances weighed more in favor of T.R. given how long he had been parenting R.R. In any event, T.T.'s arguments invite this court to reweigh the evidence, which we cannot do. See *In re B.D.-Y.*, 286 Kan. at 705.

In sum, we conclude substantial competent evidence supports the findings made by the district court as it weighed and decided the competing parental presumptions presented here.

b.  *Unconscious bias, prejudice, and personal preference*

T.T. argues the district court abused its discretion by arbitrarily and unreasonably weighing the competing parental presumptions based on unconscious bias, prejudice, and

20

personal preference. To demonstrate this alleged bias, T.T. points to several statements in the district court's opinion which he claims show the court was predisposed to give more deference to the marital presumption of legitimacy than to his biological connection to R.R., regardless of the evidence presented at the hearing:

- "[I]t is the Court's belief that [T.R.] is currently the legal father of the child."

- "[T]he Court is of the opinion that no evidence presented at the hearing would compel the Court to believe that it is in the best interest of the child to undo the current legal status of [T.R.] as the child's father despite the biology of the child."

- "It has been this Court's experience, personal and observed, after being involved in many adoptions and other cases similar to this, that the biology is probably the most insignificant factor regarding a relationship of a parent and child that there is. It is the commitment that truly counts."

- "[S]everal courts, including those in Kansas have applied a presumption of legitimacy of a child born in wedlock as being one of the strongest presumptions known to the law."

- "[T]he Court adopts that presumption as not being overcome by any of the evidence presented by [T.T.] in regards to the best interest of the child."

The district court's comments, when read in isolation, could give an impression of bias against T.T. But when the opinion is read in its entirety, it reflects the court properly based its ruling on the *Greer* factors, not on a preferential view of the marital presumption. The district court correctly recognized T.R.'s presumption was first in time because he was married to Mother when R.R. was conceived and born and that T.T., as the party later seeking to establish paternity, bore the burden of "going forward with the

21

evidence." See K.S.A. 2022 Supp. 23-2208(b). The district court also properly cited current Kansas law on the presumption of legitimacy. See *In re M.F.*, 312 Kan. at 340 (citing *Bariuan v. Bariuan*, 186 Kan. 605, Syl. ¶ 3, 352 P.2d 29 [1960]) (The "ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law."). And the district court's comment about biology being an insignificant factor was not made in reference to T.T.'s biological connection to R.R. Instead, the comment related to the court's belief in "the assertions of [T.R.] and his family that the biology of the child does not matter to them."

Throughout its opinion, the district court referenced the parties' competing presumptions of paternity and addressed its obligation to proceed as outlined in *Greer* and its duty to consider the *Greer* factors in determining R.R.'s best interests. Significantly, the court expressly denied relying on the presumption of legitimacy in making its decision:

> "The last consideration that the Court is going to address, and would like to make clear that whether or not it is a valid consideration, the Court would make the decision of legal paternity to [T.R.] without it. The *Farbo vs. Greer* [c]ourt discusses the fact that several courts, including those in Kansas have applied a presumption of legitimacy of a child born in wedlock as being one of the strongest presumptions known to the law. In reviewing the case, the Court is not certain as to the Court of Appeals positions regarding the legitimacy of this presumption at this time. In reading *Farbo v. Greer*, the Court believes that it still exists despite the clear right of biological father to attack the presumption in consideration of the child's best interest. The Court just wishes to note that this presumption, if it is still accepted as the common law of our State, does weigh in favor of [T.R.] and the Court adopts that presumption as not being overcome by any of the evidence presented by [T.T.] in regards to the best interest of the child. *Again, the Court wants to emphasize that it would have made the same decision regardless of the application of this presumption based upon the best interest of the child and the factors set out above.*" (Emphasis added.)

And in denying T.T.'s motion to alter or amend, the district court judge again reiterated his decision was based on the *Greer* best-interest factors and denied he was influenced by any bias against T.T. or in favor of T.R.:

- "Certainly, I gave [T.T.] the full benefit of his presumption. It was never a ruling that his presumption couldn't overcome the presumption of [T.R.]. It was totally a question of which presumption was weightier for the best interest of the child."

- "I did bring up the presumption of legitimacy, and I made it clear in my opinion, I want to make it clear now that my decision was made in favor of [T.R.] without the presumption of paternity—or legitimacy. I think from the *Greer* case that the presumption of legitimacy is still a valid factor to be considered by the court, but I want to make it clear that, even if it's not, my decision would have been the same as to the best interest of the child without that presumption of legitimacy."

- "For all practical purposes, [T.R.] is the father of the child legitimately unless this court changed that. He's on the birth certificate. He was married to the mother at the time of the child's birth, and I certainly have given [T.T.] the full opportunity to present his case to the court as to why it would be in the best interest to accept his presumption of paternity pursuant to biology, and I also considered the relationship that he developed with the child through basically the consent of the mother and weighed all of that against the presumption of [T.R.] and the relationship that he has developed with the child."

- "In this case, we have two fathers that want to be the father. They both have a presumption that is valid. I weighed the best interest of the child against the—I guess in light of those presumptions and made the decision that is in the best interest of the child that [T.R.] continue to be the father."

23

- "I had to apply all the factors and make a decision based on those factors, and certainly several of those factors are weighed against [T.T.], but I gave him a full benefit of a full hearing and the decision is made totally on the best interest of the child, and everything that's unfair to [T.T.] would be equally unfair to [T.R.] if I had made the decision in [T.T.]'s favor."

- "But I also want to make it clear that my opinion is not based on [T.T. having an affair with Mother]. It's not based on bias toward [T.T.] as a result of that. I'm still looking, as required in *Greer*, at what's the best interest of the child moving forward."

- "I completely indicated when I brought [T.T.'s affair with Mother] up that I put no weight on that. I actually think the law probably would allow me to, but I put no weight on that. I put no weight on the fact that he was an interloper into an existing relationship. I read some cases that are kind of old bring that up, bring that exact point up, but I'm not using any of that in my decision here today. I'm taking totally the best interest of the child moving forward. I didn't give any more weight to the paper than I gave to the biology. I totally looked at the best interest of the child from this point forward based under all the circumstances."

Based on a comprehensive and careful review of the record, we conclude the district court properly weighed the parties' competing presumptions of paternity—without bias or prejudice—by following the KPA's statutory scheme and the guidance set forth in *Greer*.

*Conclusion*

The evidence presented at the hearing left the district court with an impossible decision. T.T. and T.R. were both good fathers who loved R.R. and wanted to be in his

life. Both would provide R.R. with a stable and supportive home. Substantial competent evidence supports the district court's conclusion that T.R.'s presumption of paternity is based on "the weightier considerations of policy and logic, including the best interests of the child." See K.S.A. 2022 Supp. 23-2208(c). As a result, we cannot say that the district court abused its discretion in making its decision.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

* * *

STEGALL, J., dissenting: Today's decision begins, "[t]he Kansas Parentage Act (KPA), K.S.A. 2022 Supp. 23-2201 et seq., recognizes claims of parentage based on genetics, adoption, and other circumstances giving rise to statutory presumptions of parentage." Slip op. at 2. As I have previously explained in a series of parentage cases, this is contrary to the plain language of the statute and turns policies established by our Legislature upside-down.

Over the past several years, a majority of this court has conjured the idea of a "presumption of parentage," injected it into Kansas statutes, and then acted as though it was there all along. But no matter how many times the majority repeats the phrase and uses it to subvert the plain language of the Kansas Parentage Act, it still doesn't appear in our law—either in letter or spirit. "There is simply no such thing as a presumption of parenthood in Kansas law. There is only a presumption of *paternity* or *maternity*." *In re Adoption of T.M.M.H.*, 307 Kan. 902, 932, 416 P.3d 999 (2018) (Stegall, J., concurring and dissenting).

Our court's habitual ignoring of the distinction between parenthood or parentage (a legal determination) on the one hand, and paternity or maternity (a factual determination

25

grounded in biological reality), on the other, is the root of the problem. "Forgotten" by today's majority "is the clear statutory statement that the parent-child relationship is exclusively defined as the 'legal relationship existing between a child and the child's *biological or adoptive* parents.'" 307 Kan. at 933 (Stegall, J., concurring and dissenting) (quoting K.S.A. 2016 Supp. 23-2205). "The ordinary meaning of the words chosen by our Legislature establishes that the presumptions of paternity in the KPA are aimed at determining whether a biological relationship exists." 307 Kan. at 930 (Stegall, J., concurring and dissenting). "[U]nder any accepted mode of statutory interpretation, the notion that the plain language of the Kansas Parentage Act means that a person not biologically related to a child can 'become' a biological parent is untenable." *In re M.F.*, 312 Kan. 322, 354, 475 P.3d 642 (2020) (Stegall, J., dissenting); *In re W.L.*, 312 Kan. 367, 385, 475 P.3d 338 (2020) (Stegall, J., dissenting) (same). But once more, this is the road the majority chooses to travel today.

I would instead reverse course on this court's misguided interpretations of the Kansas Parentage Act, reverse the judgment of the district court, and remand this matter for further proceedings under a proper understanding of the statute.

WILSON, J., joins the foregoing dissenting opinion.